**DENNY CONSTRUCTION, INC.,**
a Colorado corporation,
Petitioner

v.

**CITY AND COUNTY OF DENVER**, Colorado, acting through its **BOARD OF WATER COMMISSIONERS**, a municipal corporation of the State of Colorado, Respondent.

No. 07SC236.

Supreme Court of Colorado,
En Banc.

Jan. 12, 2009.

Peterson Dymond Reagor, LLP, David D. Schlachter, Douglas W. Colville, Ashley R. Chagnon, Greenwood Village, Colorado, Attorneys for Petitioner.

Patricia L. Wells, Gail J. Rosenchein, Kristi K. Riegle, Daniel J. Arnold, Denver, Colorado, Attorneys for Respondent.

John Suthers, Attorney General, Friedrick C. Haines, First Assistant Attorney General, William V. Allen, Assistant Attorney General, Skippere S. Spear, Assistant Attorney General, Denver, Colorado, Attorneys for Amicus Curiae the State of Colorado.

Rachel L. Allen, Denver, Colorado, Attorney for Amicus Curiae the Colorado Municipal League.

Justice EID delivered the Opinion of the Court.

In this action for breach of contract, we are asked to determine whether a construction contractor may recover lost profit damages from the breaching party that are attributable to impaired bonding capacity. Petitioner, Denny Construction Inc. ("Denny"), and Respondent, the City and County of Denver acting through its Board of Water Commissioners (the "Board"), brought breach of contract claims against each other after the Board declared Denny in default of a contract for the construction of the Board's new headquarters. After the declaration of default, Denny's surety reduced Denny's bonding capacity, and later refused to underwrite bonds for Denny at all. Denny was unable to obtain bonds from another surety, and it alleged that its lack of bonding capacity prevented it from continuing to bid on public works contracts, which accounted for approximately half of Denny's business at the time.

A trial was held, and the jury found that the Board, not Denny, breached the contract. The jury went on to award Denny $845,000 in lost profits due to impaired bonding capacity.

The court of appeals reversed the trial court. *See Denny Constr., Inc. v. City & County of Denver*, 170 P.3d 733, 740 (Colo. App.2007). The appellate court held that lost profits due to impaired bonding capacity are "speculative as a matter of law." *Id.* at 739. In addition, the court found that lost profits in this case were "not reasonably foreseeable" because there was no evidence that the Board actually knew that Denny would lose profits if its bonding capacity were impaired. *Id.*

We now reverse the court of appeals. First, we hold that lost profits due to impaired bonding capacity are not speculative as a matter of law. Instead, we find that claims of lost profits due to impaired bonding capacity, like all claims for lost profits, must be established with reasonable certainty. Second, we find that the court of appeals applied an incorrect legal standard to determine whether the lost profits in this case were reasonably foreseeable. The question is not, as the court of appeals held, whether the Board *actually knew* that Denny would suffer lost profits due to impaired bonding capacity, but whether it knew *or should have known* that such loss would probably occur. We therefore reverse the court of appeals,

and remand the case for further proceedings consistent with this opinion.

## I.

Denny is a general contractor that has worked on both private and public construction projects in the Denver area for over thirty years. The Board is a political subdivision of the State of Colorado, and it provides water to the Denver metropolitan area. Sometime during 2001, the Board began planning to build a new headquarters for its operations, and after conducting a public bidding process, the Board awarded Denny a contract to build a facility in Fraser, Colorado for $3.5 million. This project came to be known as the Moffat Project.

The contract called for completion of the facility by July 2003. However, Denny repeatedly requested extensions, citing delays due to weather. The Board extended the deadline to October 2003 because of the weather delays, but did not grant additional extensions sought by Denny. Denny failed to meet the October deadline, and the work was still not fully completed when the Board took occupancy of the facility in November 2003.

Because of the unfinished work, the Board withheld around $260,000 of the contract price and ultimately declared Denny in default in April 2004. The Board also filed a claim with Denny's surety, Insurance Company of the West ("ICW"). As a result of the Board's claim, ICW decreased Denny's bonding capacity,[1] and in August 2004, stopped underwriting bonds for Denny altogether. One of Denny's subcontractors subsequently filed suit against Denny, the Board, and others, seeking payment of funds withheld by the Board. Denny and the Board filed claims against each other for breach of contract. All claims settled before trial, with the exception of these claims.

A jury trial was held from April 25th through May 5th, 2005. Denny argued that it had substantially completed the contract, that the contract permitted delays due to inclement weather, and that the Board breached the contract by not granting additional extensions due to bad weather. The Board countered that the contract only required time extensions due to "abnormal" weather, and that the further extensions sought by Denny—attempting to extend the completion date beyond October 2003—were unwarranted.

As to damages, Denny presented evidence—including financial statements, lists of contracts, and other documents, as well as testimony from individuals involved in the Moffat Project—in support of its claim that it had lost profits as a result of the Board's declaring default and filing a bond claim. This evidence demonstrated that Denny was an established and generally profitable construction company and more specifically, that during the years 2000 through 2003, about half its revenues came from public works projects that required bonds. However, profitability declined after the Board declared default on the Moffat Project. Denny's owner, Bill Denny, attributed this decline to the Board's declaration of default. In particular, he testified that Denny began increasing its public works projects in 1995 and that Denny did work for a variety of public entities in Colorado. He also testified that Denny had not been declared in default on prior projects. However, he stated that after the Board's declaration of default and filing of a bond claim, Denny could no longer secure the bonds necessary to bid on public works projects. Bill Denny further testified that such projects were available and that he would have bid on them if he could have obtained the necessary bonds.

Two individuals familiar with sureties also testified for Denny. Kevin Lorenz, an underwriter employed by ICW, said that prior

---

1. According to the testimony of Kevin Lorenz, an ICW bond underwriter, bonding capacity is measured by an aggregate max and a single-job max. The aggregate max indicates the total dollar amount of work, measured on a cost-to-complete basis, that a contractor is pre-approved to undertake. The single-job max, on the other hand, indicates the maximum dollar amount of any single project that a contractor is pre-approved to undertake. Prior to the Board's declaration of default, Denny had a $1.5 million single-job max and a $4 million aggregate max. By August 2004, however, ICW had terminated Denny's bonding capacity.

bond claims are an important factor in the decision whether to underwrite additional bonds for a contractor. He noted that Denny had not been the subject of any bond claims prior to the Moffat Project, and he testified that the Board's claim was primarily responsible for ICW's decision to reduce and eventually terminate Denny's bonding capacity. Steve Walker, a bonding agent who helped Denny obtain bonds, testified that after the Board's bond claim, ICW and three other sureties refused to underwrite bonds for Denny. Walker sent a letter to Denny stating that Denny probably would not be able to obtain bonds because of the issues concerning the Moffat Project.

Denny's damages expert, Jack Harris, testified that the loss of bonding capacity caused a significant drop in Denny's profits. Harris explained how he had analyzed data from 2000 through 2005, including market and industry conditions, Denny's financial statements and bidding history, the number of public works contracts typically won by Denny, and the profits from those contracts. Based on this analysis, Harris calculated that Denny had incurred pre-trial lost profits of $537,525 and that Denny would incur post-trial lost profits of an additional $1,025,204. The Board presented no expert testimony of its own, instead relying solely on its cross-examination of Denny's expert.

Denny also called some of the Board's employees who had worked on the Moffat Project. Michael Leister, the Board's chief of construction management, had been involved in the Board's construction projects for twenty-two years. Leister testified that minimum bonding capacity is required to obtain public works contracts and that the Board would not even consider bids from contractors who did not have the requisite bonding capacity. John Diebel, the Board's director of engineering, had been with the Board for thirty-one years, and had spent thirteen years overseeing the construction of the Board's various facilities. Diebel agreed with Leister, and added that a contractor's bonding capacity was an important factor in dealing with public entities. When later called by the Board, Diebel testified that after consulting with other Board personnel he made the final decision to declare Denny in default. Both Diebel and Leister stated that the Board evaluates a contractor's past performance on similar construction projects before awarding a contract. They both also indicated that they were familiar with the role of sureties in public works projects and that they had taken classes on that subject.

The evidence presented at trial established that the Board was generally familiar with Denny's financial condition and profitability based upon the information contained in Denny's prequalification application. Leister testified that, as part of the prequalification process, the Board examined both the contractor's bonding capacity as well as its past performance with similar projects. Denny also demonstrated that these similar projects—that is, those requiring public bonds—totaled close to half its business over the past decade.

The jury returned a verdict for Denny, concluding that the Board, not Denny, breached the contract. The jury went on to award Denny $1,063,000 in damages, which included $380,000 for pre-trial lost profits and $465,000 for post-trial lost profits.[2]

On appeal, the Board challenged the jury's award of damages.[3] On review, the court of appeals reversed. The court first held "that a claim that a party would have received profits from future public project contracts if its bonding capacity had not been impaired *is speculative as a matter of law.*" *Denny Constr.*, 170 P.3d at 739 (emphasis added). The court went on to hold "that the damages sought by Denny for lost profits were not reasonably foreseeable" because there was no evidence that the Board actually knew that Denny would lose profits if its bonding capacity were impaired. *Id.* We granted certiorari and now reverse the court of appeals.

---

2. The total damages for lost profits awarded by the jury—$845,000—were well below the over $1.5 million sought by Denny.

3. The Board also made a limited challenge to the breach of contract finding, but the court of appeals rejected this argument. The Board did not raise this issue on certiorari to this court.

## II.

■■ The general rule in Colorado is that damages for lost profits may be awarded in breach of contract cases. *See Colorado Nat'l Bank of Denver v. Friedman,* 846 P.2d 159, 174 (Colo.1993) (stating that lost profits caused by breach of contract "are included in the damages to be recovered")(citation and quotation omitted); *Lee v. Durango Music,* 144 Colo. 270, 279, 355 P.2d 1083, 1088 (1960) ("[T]he loss of profits from the interruption of an established business may be recovered ....") (citation and quotation omitted); *Lockwood Grader Corp. v. Bockhaus,* 129 Colo. 339, 350, 270 P.2d 193, 199 (1954) (same). In order to recover lost profits, two requirements must be met.

■ First, lost profits are recoverable only if they can be proven with reasonable certainty. *See Pomeranz v. McDonald's Corp.,* 843 P.2d 1378, 1381–82 (Colo.1993); *Friedman,* 846 P.2d at 174 (stating that lost profits must not be "open to the objection of uncertainty"). As we have observed, a plaintiff seeking future damages must provide the trier of fact with "(1) proof of the fact that damages will accrue in the future, and (2) sufficient admissible evidence which would enable the trier of fact to compute a fair approximation of the loss." *Pomeranz,* 843 P.2d at 1382. Thus, as long as the fact of future loss is certain, the amount of damages awarded may be an approximation. *Id.* As we stated recently in *Acoustic Marketing Research, Inc. d/b/a Sonora Medical Systems v. Technics, LLC,* "[w]here there is sufficient reliable evidence [that lost profits] would have accrued but for defendant's breach, the jury should be permitted to assess the amount of the [profits] from the best evidence the nature of the case allows." 198 P.3d 96, 99 (Colo.2008) (citing *Pomeranz,* 843 P.2d at 1382).

■ Second, such profits must be "the foreseeable result of a breach at the time the contract was made." *Giampapa v. Am. Family Mut. Ins. Co.,* 64 P.3d 230, 240 (Colo. 2003) (citing Restatement (Second) of Contracts, §§ 351 & 352 (1981)). We have stated that the test of foreseeability is whether, "*at the time the parties entered into the contract,* the defendant reasonably could have anticipated from the facts or circumstances that the defendant *knew or should have known* that these damages would probably be incurred...." *Id.* (second emphasis added).

In this case, the court of appeals held that Denny failed both requirements. Focusing first on the requirement of reasonable certainty, the court held that lost profit damages due to impaired bonding capacity can never be proven with reasonable certainty and thus were "speculative as a matter of law." *Denny Constr.,* 170 P.3d at 739. Second, it held that the lost profit damages claimed by Denny were not reasonably foreseeable under the facts of this case because there was no evidence that the Board actually knew that Denny would suffer damages due to impaired bonding capacity. *Id.* We address each holding in turn.

### A.

In holding that, in all cases, lost profits due to impaired bonding capacity are speculative as a matter of law, the court of appeals reasoned:

> Whether a party bidding on a particular public project is successful in obtaining the contract depends on a host of factors in addition to bonding capacity. Moreover, profit on such a contract is dependent, in part, on unpredictable future events such as weather, changes in labor and material costs, and changes in management personnel, to name a few. In short, Denny's theory of lost profits is based on inferences piled upon inferences.

*Denny Constr.,* 170 P.3d at 739 (citations and quotation omitted). The court of appeals thus identified two reasons for its conclusion: first, that bonding capacity is just one factor to be considered in awarding public works projects; and second, that the profit to be made in such contracts is dependent on unpredictable future events. *Id.* We find that, while the court of appeals' observations may be true, they do not render lost profit damage awards based on impaired bonding capacity speculative as a matter of law.

### 1.

It is undoubtedly true that bonding capacity is one factor to be considered in awarding

public works contracts. However, it is also true that it is an extremely important one. Indeed, the Board's own personnel who had worked on the Moffat Project, Michael Leister and John Diebel, testified that bonding capacity is an important factor in obtaining public works contracts. In fact, bonding capacity is so important to the award of public works contracts that the General Assembly has set a minimum bond requirement equal to half of the contract price, and has declared that a contract may not be awarded to a contractor who cannot meet this requirement. *See* §§ 38–26–105, –106, C.R.S. (2008). Without the requisite bonding capacity, a contractor cannot be awarded a public works contract. The court of appeals' diminishment of bonding capacity as a factor in obtaining public works contracts fails to recognize the purpose of the bonding system.

The goal of the bonding system is to minimize "retentions in and delays in the completion of construction contracts" while also "fostering a healthy and viable construction industry." § 24–91–101, C.R.S. (2008). To that end, the General Assembly has implemented a competitive bidding process for "[a]ll construction contracts for public projects," and has required that those contracts "be awarded with reasonable promptness ... to the low *responsible* bidder." § 24–92–103(1), (7), C.R.S. (2008) (emphasis added). Bonding capacity provides the best measure of a contractor's responsibility.

A contractor must undergo a rigorous vetting process to determine how much, if any, bonding capacity a surety is willing to extend. The surety has a motivation to thoroughly and accurately assess a contractor's responsibility before underwriting a bond because the surety "must assume or correct any flaws in performance" if the contractor defaults. *Transamerica Premier Ins. Co. v. Brighton Sch. Dist.*, 940 P.2d 348, 352 (Colo. 1997); *see also* 6 Philip J. Bruner & Patrick J. O'Connor, Jr., *Bruner & O'Connor on Construction Law* 410 n. 9 (2002) ("[S]urety bonds are the most comprehensive risk management tool to address contractor default.") (citation and quotation omitted). Consequently, "[ s]urety bonding is a careful, rigorous, and professional process that pro-duces the following end product: an analysis of the potential risk of contractor default." *Id.* at 408 (citation and quotation omitted); *see also id.* ("Surety companies pre-qualify contractors and then assure project owners that these contractors will perform on schedule.") (citation and quotation omitted). The factors considered by the surety include the contractor's financial situation, character and reputation for integrity, competence and experience, workload capacity, and areas of expertise. *See id.* at 459–60; *see also* Brief of Amicus Curiae the State of Colorado at 2–3 (listing factors such as the contractor's finances, past performance on previous projects, workload capacity, and reputation). The surety thus bases a contractor's bonding capacity on a comprehensive analysis of the same factors that are critical to the ultimate decision as to whether that contractor is sufficiently responsible. *See Pallas v. Johnson*, 100 Colo. 449, 452, 68 P.2d 559, 560 (1937) (stating that factors for determining responsibility include "pecuniary ability ... judgment and skill, and the ability to promptly and satisfactorily carry on and complete the contract"); *see also McNichols v. City & County of Denver*, 130 Colo. 202, 209–10, 274 P.2d 317, 321 (1954) (applying *Pallas*); *Broadmoor, L.L.C. v. Ernest N. Morial New Orleans Exhibition Hall Auth.*, 867 So.2d 651, 656 (La.2004) ("In determining bidder responsibility, the public entity may look to financial ability, skill, integrity, business judgment, experience, reputation, quality of previous work on contracts, and other similar factors bearing on the bidder's ability to successfully perform the contract.").

At bottom, then, a reduction in bonding capacity indicates a reduction in responsibility, which, in turn, will impair a contractor's ability to obtain public works contracts. This is not speculation; on the contrary, it is the intended function of the bonding system.

Importantly, Denny's claim for lost profits does not ignore the fact that factors other than bonding capacity are considered in awarding public contracts. Instead, Denny argues that, based on its history of obtaining public works contracts, it met those other factors considered in the award process.

What was missing, its argument continues, was the necessary bonding capacity without which it could not be awarded any contracts. We thus reject the court of appeals' rationale that the fact that bonding capacity is but one factor considered in awarding public works contracts renders lost profits inherently speculative in all cases.

### 2.

For much the same reason, we find that the court of appeals' second premise—namely, that profits from future public works contracts depend upon "unpredictable future events such as weather, changes in labor and material costs, and changes in management personnel, to name a few," *Denny Constr.,* 170 P.3d at 739—does not lead to the conclusion that lost profits due to impaired bonding capacity are speculative in all cases.

■ Our precedent indicates that a plaintiff contractor may establish a reasonable basis for computing the amount of lost profits by presenting evidence of prior profitability. *See, e.g., Lee,* 144 Colo. at 280, 355 P.2d at 1087–88 (stating that lost profits are "anticipated profits which have their foundation in the past experience of the concern said to have suffered the loss" and describing the method of proving the amount of lost profits); *see also Tull v. Gundersons, Inc.,* 709 P.2d 940, 945 (Colo.1985) (citing *Lee,* 144 Colo. at 278, 355 P.2d at 1087); *Graphic Directions, Inc. v. Bush,* 862 P.2d 1020, 1024 (Colo.App.1993) ("[A] business has the ability to produce specific historical records showing customary net profits from which a reasonable reliable estimate of its losses can be made.") (citing *Lee,* 144 Colo. 270, 355 P.2d 1083). Although "there is not a per se rule requiring a showing of past profits, ... such evidence, or the lack thereof, is highly relevant to the issue of lost profits." *W. Cities Broad., Inc. v. Schueller,* 849 P.2d 44, 49 (Colo.1993). Historically, then, we have relied upon the rule of reasonable certainty—that is, that "the loss of profits from the interruption of an established business may be recovered where the plaintiff makes it reasonably certain by competent proof what was the amount of his profits,"—to weed out speculative claims of lost profits. *Lee,* 144

Colo. at 279, 355 P.2d at 1088 (citation and quotation omitted).

In *Lee v. Durango Music,* for example, we applied this rule to a breach of lease claim brought by tenants who operated a music and electronic appliances store on the leased premises. *Id.* at 271, 355 P.2d at 1084. The tenants claimed that they had lost profits because the landlord's remodeling had prevented them from carrying out their normal business operations. *Id.* at 273–74, 355 P.2d at 1085. We held that lost profits were appropriate damages, although we remanded the case for a new trial as to the amount of damages. *Id.* at 280, 355 P.2d at 1088. In particular, we concluded that lost profits were not speculative because "an established business ... has in its power to prove the capital invested, the amount of the monthly and yearly expenses of operating the business, and the monthly and yearly income derived from it for a period prior to the interruption." *Id.* at 279–80, 355 P.2d at 1088. We explained that "from this fixed data and these facts an estimate can be made of the plaintiff's loss during the period the business was interrupted." *Id.* at 280, 355 P.2d at 1088.

We reached a similar outcome in *Carlson v. Bain,* 116 Colo. 526, 182 P.2d 909 (1947). That case involved a claim by a rancher that the owner of ranch property had failed to deliver possession pursuant to a lease, and that consequently the rancher had been deprived of the profits that he would have earned by raising crops and livestock on the property. *Id.* at 527–28, 182 P.2d at 910. As in *Lee,* we held that lost profits were appropriate damages. *Id.* at 534, 182 P.2d at 913. We noted that the plaintiff rancher had "wide experience in farming and stock raising in Colorado," that other suitable ranch properties "were not available or obtainable," and that there was sufficient evidence of the ranch's potential productivity. *Id.* We also observed that the trial court had properly weighed "all expenses incurred in the operation of the ranch, as well as the uncertainties of weather, danger of grasshoppers and other similar casualties." *Id.*

Finally, in *Acoustic Marketing,* which involved a claim for future royalty payments

from the refurbishment of certain medical devices, we rejected the argument that damages based on lost future royalty payments are speculative as a matter of law. In that case, we observed that "royalty payments are by nature contingent on future events, such as future album sales or future oil extraction." *Acoustic Marketing*, 198 P.3d at 98,. Indeed, we recognized "the difficulties presented in measuring prospective royalties, as with prospective profits generally." *Id.* at 99. Yet we declined to find that damages based on future royalty payments "raise special concerns requiring departure from the general rule for future damages." *Id.* at 98. Instead, we held that such damages are subject to the general rule of reasonable certainty. *Id.* at 99.

Here, we do the same. There are uncertainties inherent in any estimation of future damages; however, this fact generally should not prevent a plaintiff from presenting such an estimate—based on competent evidence and reasonable inferences therefrom—and having its estimate evaluated by the trier of fact. *See Pomeranz*, 843 P.2d at 1383 ("The rule of certainty only requires that, together with the fact of damage, the plaintiff submit substantial evidence, which together with reasonable inferences to be drawn therefrom provides a reasonable basis for computation of the damage.") (citation omitted); *see also Acoustic Marketing*, 198 P.3d at 99, (same). We therefore reject the court of appeals' assertion that, because profits on public works projects depend in part on uncertain future events such as weather and personnel, lost profits due to impaired bonding capacity are inherently speculative as a matter of law.

We also reject the Board's argument that lost profits in cases of impaired bonding capacity are speculative as a matter of law because they rely on a specific uncertain event—namely, the decision of a third-party

surety to reduce Denny's bonding capacity. As noted above, a surety considers multiple factors in determining a contractor's bonding capacity, including performance on previous projects. In addition, "[i]t is clearly understood in the construction industry that a contractor's ... bonding capacity can be severely impacted by perceived performance problems or litigation on any contract." Bruner & O'Connor, *supra*, at 291. Thus, a performance dispute may cause a surety to reduce a contractor's bonding capacity, thereby restricting the contractor's ability to bid on other projects. The fact that a surety makes the decision to reduce the contractor's bonding capacity, rather than the breaching party itself, does not render lost profits due to that reduction speculative as a matter of law in all cases.

### 3.

In support of the argument that lost profit damages due to impaired bonding capacity are speculative as a matter of law, the court of appeals cited in its opinion—and the Board cites to us on review—a number of cases from the Federal Circuit and the Court of Federal Claims (in its various incarnations) holding that such damages are not available in suits against the United States.[4] *Denny Constr.*, 170 P.3d at 739. We find these cases inapposite because they are grounded on a sovereign immunity regime that is quite different from that recognized in Colorado.

■■ "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *FDIC v. Meyer*, 510 U.S. 471, 475, 114 S.Ct. 996, 1000, 127 L.Ed.2d 308 (1994). Indeed, a "waiver of the Federal Government's sovereign immunity must be unequivocally expressed in statutory text ... and will not be implied." *Lane v. Peña*, 518 U.S. 187, 192, 116 S.Ct. 2092, 2096,

4. *See, e.g., Rumsfeld v. Freedom NY, Inc.*, 329 F.3d 1320, 1333 (Fed.Cir.2003); *Lucas v. United States*, 25 Cl.Ct. 298, 310 (1992); *Rhen v. United States*, 17 Cl.Ct. 140, 143–44 (1989); *Olin Jones Sand Co. v. United States*, 225 Ct.Cl. 741, 743–44 (1980); *Rocky Mountain Constr. Co. v. United States*, 218 Ct.Cl. 665, 666, 1978 WL 8468 (1978). Contrary to the court of appeals suggestion, however, both *Mega Construction Co., Inc. v. United States*, 29 Fed.Cl. 396, 474–75 (1993),

and *Solar Turbines, Inc. v. United States*, 23 Cl. Ct. 142, 159–60 (1991), held that such damages were unavailable against the federal government under the particular facts of the case, but *not* irrecoverable as a matter of law. *See also Hirsch Elec. Co., Inc. v. Cmty. Servs., Inc.*, 145 A.D.2d 603, 605, 536 N.Y.S.2d 141 (1988) (holding that lost profit damages due to impaired bonding capacity against a municipality were not recoverable under the particular facts of the case).

135 L.Ed.2d 486 (1996). Moreover, any waiver must be strictly construed in favor of the federal government. *Id.* Thus, the rule of federal sovereign immunity is that suit against the federal government is not allowed absent an express waiver by Congress permitting suit, which is to be strictly construed. This sovereign immunity regime has compelled the Federal Circuit to restrict the availability of lost profit damages against the federal government. *See Bohac v. Dep't of Agric.,* 239 F.3d 1334, 1339–40 (Fed.Cir.2001) (given federal sovereign immunity doctrine, non-pecuniary damages are not available as "consequential damages" under federal whistleblower statute). In fact, the Federal Circuit has held that, as a general matter, lost profit damages from contracts not obtained due to the federal government's breach are not available as a matter of law. *Rumsfeld v. Freedom NY, Inc.,* 329 F.3d 1320, 1333 (Fed.Cir.2003).

By contrast, it is well established in Colorado that the government must operate under the rules that apply to contracts between private parties. As we recently explained in *Colorado Department of Transportation v. Brown Group Retail, Inc.,* 182 P.3d 687, 689 (Colo.2008), the common-law doctrine of sovereign immunity has been abrogated in Colorado since 1971. As a result, the question "whether, and to what extent, the state should be immune from liability is exclusively a legislative prerogative." *Medina v. State,* 35 P.3d 443, 453 (Colo.2001); *accord Brown Group,* 182 P.3d at 689. Thus, the rule in Colorado is precisely the opposite of the federal system: the state and its subdivisions are subject to the same liability as private entities, unless the General Assembly has affirmatively protected the state from liability through immunity legislation. Thus far, the General Assembly has not exempted the state or its subdivisions from breach of contract claims, nor has it otherwise limited damages available in cases such as this. *See* § 24-10-106(1), C.R.S. (2008) ("A public entity shall be immune from liability in all claims for injury *which lie in tort or could lie in tort* ....") (emphasis added); *Robinson v. Colo. State Lottery Div.,* 179 P.3d 998, 1003 (Colo.2008) ("[T]he [Colorado Governmental Immunity Act] was not intended to apply to actions grounded in contract.").

We are mindful of the concerns expressed by the Attorney General as amicus that, by applying our general lost profits rule to government entities that breach their contractual obligations, such entities will be subject to higher damage awards. The potential for such awards, the Attorney General continues, will have to be weighed in the balance when government entities are deciding whether to take action against a public contractor—action that might later be deemed to be a breach of contract. Brief of Amicus Curiae the State of Colorado at 6; *see also Transamerica,* 940 P.2d at 352 n. 3 (noting that "public entities are constrained by tight budgets" and that "[d]elays and shoddy work" have "profound consequences to both the public entity and the general public"). While these are important public policy concerns, we believe that they should be directed to the General Assembly.

**4.**

In sum, we reverse the court of appeals' conclusion that lost profit damages due to impaired bonding capacity can never be reasonably certain and are therefore speculative as a matter of law in all cases. Instead, we find that claims of lost profits due to impaired bonding capacity, like all claims for lost profits, must be established with reasonable certainty. We do not reach the question of whether the claim of lost profits was established with reasonable certainty in this case.

**B.**

The court of appeals also held that Denny failed to satisfy the requirement that lost profits be reasonably foreseeable at the time that Denny entered into the contract with the Board. *See Denny Constr.,* 170 P.3d at 739–40. Because the court of appeals applied an incorrect subjective standard for determining foreseeability, we reverse this holding as well.

The requirement of foreseeability has long been a part of Colorado contract law. *See, e.g., W. Union Tel. Co. v. Trinidad Bean & Elevator Co.,* 84 Colo. 93, 96, 267 P.

1068, 1069 (1928) (adopting the rule of *Hadley v. Baxendale*, 9 Exch. 341, 156 Eng. Rep. 145 (1854)). The requirement is objective, focusing on whether "*at the time the parties entered into the contract . . . the defendant knew or should have known* that these [lost profit] damages would probably be incurred by the plaintiff if [the defendant] breached the contract." *Giampapa*, 64 P.3d at 240 (second emphasis added) (quotation omitted).

The Board argues that we should follow *Lewis Jorge Construction Management, Inc. v. Pomona Unified School District*, 34 Cal.4th 960, 22 Cal.Rptr.3d 340, 102 P.3d 257, 267 (2004), in which the California Supreme Court held that a contractor failed to establish that lost profits due to impaired bonding capacity were the reasonably foreseeable result of a breach of contract by a school district. The court reasoned:

> As the [School] District pointed out at oral argument, when it signed the contract *it did not know* what Lewis Jorge's balance sheet showed or what criteria Lewis Jorge's surety ordinarily used to evaluate a contractor's bonding limits. *Absent such knowledge*, the profits Lewis Jorge claimed it would have made on future, unawarded contracts were not actually foreseen nor reasonably foreseeable.

*Id.* (emphases added). The court in *Lewis Jorge* cited only the school district's lack of *actual knowledge*, without making any inquiry into what the school district should have known. *Id.* It therefore applied a subjective test of foreseeability—a test that is inconsistent with the objective test we recognized in *Giampapa*. 64 P.3d at 240. We therefore decline the Board's invitation to follow *Lewis Jorge*.

In mistaken reliance on *Lewis Jorge*, the court of appeals found that the lost profit damages in this case were not reasonably foreseeable, stating:

> There is no evidence in the record that the parties contemplated a loss of bonding capacity when they entered into the contract, that [the Board] *knew* the extent of Denny's bonding capacity, that [the Board] *knew* Denny's overall financial condition, or that [the Board] *knew* what effect declaring Denny in default would have on

Denny's bonding capacity and future business prospects.

*Denny Constr.*, 170 P.3d at 740 (emphases added). The court of appeals merely addressed the question of whether the Board *actually knew* that declaring default and filing a bond claim would probably cause Denny to lose profits. It did not consider whether, in spite of any lack of actual knowledge, the Board nevertheless *should have known* that its actions would probably have this effect. We therefore find that the court of appeals applied an incorrect subjective standard of foreseeability to the facts of this case. We do not reach the question of whether the Board knew or should have known that its actions would probably cause Denny to lose profits.

## III.

In sum, we reverse the court of appeals' holding that lost profit damages due to impaired bonding capacity are never reasonably certain and thus speculative as a matter of law. Instead, we find that claims of lost profits due to impaired bonding capacity, like all claims for lost profits, must be established with reasonable certainty. Second, we find that the court of appeals applied an incorrect legal standard to determine whether the lost profits in this case were reasonably foreseeable. The question is not, as the court of appeals held, whether the Board *actually knew* that Denny would suffer lost profits due to impaired bonding capacity, but whether it knew *or should have known* that such loss would probably occur. We therefore reverse the court of appeals, and remand the case for further proceedings consistent with this opinion.