**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

W.R. HANSEN, d/b/a Hansen Drilling,

    Plaintiff Counter Defendant -
Appellee

v.

LKA GOLD INCORPORATED, a
Delaware corporation,

    Defendant Counterclaimant -
Appellant.

No. 19-1193
(D.C. No. 1:16-CV-01158-WJM-SKC)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BRISCOE**, **BACHARACH**, and **McHUGH**, Circuit Judges.
_____

W.R. Hansen, d/b/a Hansen Drilling ("Hansen") filed this breach of contract

action against LKA Gold Incorporated ("LKA Gold") after LKA Gold terminated his

contract for exploratory drilling services at a Colorado mine.  A jury awarded Hansen

$72,900 in damages.  In this appeal, LKA Gold challenges the jury instructions and

the district court's denial of its motion for judgment as a matter of law ("JMOL") on

_____

[*] After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist in the determination of
this appeal.  *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G).  The case is therefore
ordered submitted without oral argument.  This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel.  It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

two of Hansen's damages claims.  Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.  Background

Hansen has worked in the mining industry for fifty-six years, frequently as a drilling contractor.  In 2014, LKA Gold hired Hansen to perform exploratory drilling at the Golden Wonder Mine near Lake City, Colorado.  After some back and forth, the parties executed a contract on October 20, 2014.  The contract obligated Hansen to provide "general drilling services."  Aplt. App. Vol. 4 at 729.  It required LKA Gold to provide "all rights of ingress or egress," as well as real property for temporary buildings, storage containers, and dry vans.  *Id.* at 732.  It further required LKA Gold to prepare and maintain roads, building sites, and drill locations.  The contract emphasized that time was of the essence.

The contract contained a detailed payment schedule that assumed a three-man crew, under which Hansen was entitled to a mobilization fee of $10,000; per diem rates of $100 per man per day; an hourly rate of $210 per hour, which also applied to "delays caused by the owner," *id*. at 729; a standby rate of $70 per hour; charges on drill bits, core boxes, and other equipment at cost plus 10%; payment for minimum drilling footage of 2700 feet at $27 per foot; and a $10,000 advance, to be deducted from the final invoice.  The contract entitled the prevailing party in any legal action relating to the contract to recover attorney's fees and costs.

2

Hansen made multiple trips over fifteen days to bring his tools and equipment to the site from Montana, where he lived. He completed that process on November 5. Employees of Coal Creek Construction, Inc. ("Coal Creek") were at the site under the supervision of Coal Creek's owner, Mikahel Schell. LKA Gold had hired Coal Creek to do preliminary, exploratory mining at the Golden Wonder Mine before it contracted with Hansen.

Hansen and Schell had a contentious, strained relationship from the start, and disagreements ensued. It is uncontested that Hansen had no place to park his three dry vans at the site and that some of Coal Creek's contractors created a traffic jam and blocked Hansen's access to the site. Hansen also complained about the size of the drilling station that Coal Creek had prepared and asked LKA Gold to provide a sump pump to achieve the necessary ground conditions. Hansen expressed concerns about compliance with the requirements of the Mine Safety and Health Administration. And Hansen warned LKA Gold about drainage problems and his worry that absent proposed mitigation measures (which Schell rejected), a drilling hole would flood in violation of the mining permit.

By contrast, Schell insisted that the drilling station was ready when Hansen arrived and that the sump pump was not necessary. Schell accused Hansen of frequent trips away from the site, unacceptable delays in getting underground to drill, lack of organization, and poor work performance. Schell went so far as to accuse

3

Hansen of improperly charging his time. Schell also criticized Hansen's equipment as being old, faulty, and in a state of disrepair.

Hansen began setting up his drill on November 12. But the next day, before he even started drilling, LKA Gold officially terminated the contract at Schell's recommendation. Hansen removed his equipment from the site by November 18. LKA Gold hired another drilling company, San Juan Drilling ("SJD"), to complete the job that Hansen had contracted to perform. SJD disagreed with Hansen's complaint about the size of the drilling station and the need for a sump pump. SJD drilled 5741 feet, more than twice the minimum drilling footage of 2700 feet in Hansen's contract. LKA Gold paid over $242,000 to SJD.

At the time the contract was terminated, LKA Gold had paid only the $10,000 advance to Hansen. On December 24, Hansen submitted an invoice for $37,538.10 for time spent in mobilizing and demobilizing, time spent working at the mine, and charges for a special contractor's general liability insurance policy. The invoice stated that Hansen would waive the contractually mandated minimum footage of 2700 feet at $27 per foot (for a total of $72,900) if LKA Gold promptly paid the invoice. LKA Gold refused to pay this or later invoices, so Hansen filed this diversity action[1] asserting a claim for breach of contract and seeking over $75,000 in

---

[1] Hansen is a Montana resident. LKA Gold is a Delaware corporation with a principal office in Washington. LKA Gold's wholly owned subsidiary, LKA International, Inc., a Nevada corporation, owns the Golden Wonder Mine.

4

damages for unpaid work, lost profits, and consequential damages. LKA Gold asserted a counterclaim for breach of contract.

A four-day jury trial was held in November 2018. The jury found that LKA Gold had breached the contract, but that Hansen had not. It awarded $72,900 in damages to Hansen. The jury verdict form did not contain any special questions to afford the jury an opportunity to explain the basis for its award, and the jury added no explanation. On Hansen's motion, the district court amended the judgment to also award Hansen $38,049 in attorney's fees and $26,627.45 in pre-judgment interest, plus post-judgment interest and costs. LKA Gold filed this timely appeal.

## II. Discussion

LKA Gold argues the district court erred in: (1) refusing to instruct the jury that Hansen had an implied duty to perform skillfully, carefully, diligently, and in a workmanlike manner; (2) denying LKA Gold's motion for JMOL on Hansen's claim for lost profits; and (3) denying LKA Gold's motion for JMOL on Hansen's claim for consequential damages other than lost profits.

### A. Jury Instructions

"We review a district court's decision on whether to give a particular jury instruction for abuse of discretion." *United States v. Sorensen*, 801 F.3d 1217, 1228 (10th Cir. 2015) (internal quotation marks omitted). This standard applies both to "the district court's decision to give or to refuse a particular jury instruction" and to its "shaping or phrasing of a particular jury instruction." *United States v. Bedford*,

5

536 F.3d 1148, 1152 (10th Cir. 2008).

We "view the instructions as a whole de novo to determine whether they accurately informed the jury of the governing law." *Sorensen*, 801 F.3d at 1228-29 (brackets and internal quotation marks omitted). For this inquiry, "[w]e do not decide whether the instructions are flawless, but whether the jury was misled in any way and whether it had an understanding of the issues and its duty to decide those issues." *Harte v. Bd. of Comm'rs*, 940 F.3d 498, 525 (10th Cir. 2019) (brackets and internal quotation marks omitted). "Faulty jury instructions require reversal when (1) we have substantial doubt whether the instructions, considered as a whole, properly guided the jury in its deliberations; and (2) . . . a deficient jury instruction is prejudicial." *Jones v. United Parcel Serv., Inc.*, 674 F.3d 1187, 1198 (10th Cir. 2012) (internal quotation marks omitted); *see also Lederman v. Frontier Fire Prot., Inc.*, 685 F.3d 1151, 1155 (10th Cir. 2012) ("So long as the charge as a whole adequately states the law, the refusal to give a particular requested instruction is not grounds for reversal." (brackets and internal quotation marks omitted)).

LKA Gold challenges the district court's refusal to instruct the jury regarding "Hansen's implied contractual duty to perform drilling services in a workmanlike manner" and its consequent failure to "fully inform the jury as to Hansen's obligations." Aplt. Opening Br. at 14, 13. LKA Gold's articulation of this "implied contractual duty" is fluid. At times, LKA Gold invokes negligence principles and refers to "a duty to exercise reasonable care and to perform diligently." *Id.* at 19. Elsewhere, it refers to

6

the duty as part of the "standard[]" for substantial performance.  *Id.* at 20.  It also ties

this duty to one of its "defenses."  Aplt. Reply Br. at 6.

LKA Gold proposed two jury instructions on this topic:

1. "In performing his contract, Hansen had a duty to perform in a good and workmanlike manner."  Aplt. App. Vol. 1 at 62 ("Defendant's Disputed Instruction No. C") (footnote omitted).

2. "Hansen had an implied duty under the contract to perform skillfully, carefully, diligently and in a workmanlike manner.  This includes a duty to exercise that degree of skill and knowledge normally possessed by those members of the trade in which the service provider is engaged who are in good standing in the same or similar communities."  *Id.* at 68 ("Defendant's Disputed Instruction No. E").

LKA Gold withdrew Instruction C and substituted it with Instruction E.  Hansen

objected to both instructions as biased and inaccurate, and the district court did not give

either instruction to the jury.

Because our jurisdiction is based on diversity of citizenship, we apply the

substantive law of the forum state, Colorado, to assess the district court's ruling.  *See*

*Shotts v. GEICO Gen. Ins. Co.*, 943 F.3d 1304, 1308 n.4 (10th Cir. 2019).  Colorado

law states that courts "shall use such instructions as are contained in Colorado Jury

Instruction (CJI) as are applicable to the evidence and the prevailing law."  Colo. R.

Civ. P. 51.1(1).  But if no CJI instruction exists for a subject, "the court shall instruct

the jury as to the prevailing law . . . in a manner [that] is clear, unambiguous, impartial

and free from argument."  *Id.* 51.1(2).  The proposed instructions on Hansen's implied

duty do not meet these requirements.  As a result, the district court was correct in

rejecting them.

7

To support its proposed instructions before the district court, LKA Gold relied on (1) *Houy v. Davis Oil Co.*, 486 P.2d 18 (Colo. 1971); (2) a legal encyclopedia citing general principles and non-binding cases from Alabama, Louisiana, Maine, New York, and Texas that arose in different contexts, such as horse training, home buying, and legal malpractice; and (3) a contracts treatise citing non-binding tort cases in Nebraska. On appeal, LKA Gold cites two additional Colorado cases: (1) *Samuelson v. Chutich*, 529 P.2d 631 (Colo. 1974); and (2) *Metropolitan Gas Repair Service, Inc. v. Kulik*, 621 P.2d 313 (Colo. 1980).[2] We focus on the Colorado case law because LKA Gold's other authorities are non-binding and factually distinct.

*Houy* does not support the proposed instructions. The Colorado Supreme Court did not recognize—let alone impose—an implied duty to perform drilling services in a good and workmanlike manner. The trustee of a bankrupt driller sued an oil company to recover money due on its contracts with the driller. The issue was whether the driller's breach of certain contract conditions discharged the oil company from its obligation to pay the full contract price. The court held that a driller who "substantially performed his contract by drilling wells in a good and workmanlike manner and to a

---

[2] LKA Gold adds another Colorado case in its reply brief: *Lembke Plumbing & Heating v. Hayutin*, 366 P.2d 673, 677 (Colo. 1961). That was a negligence action in which the court stated that "a negligent failure to observe [the common law duty to perform under a contract with care, skill, reasonable expedience, and faithfulness] is a tort, as well as a breach of the contract." *Id.* at 677 (internal quotation marks omitted). As discussed *infra*, LKA Gold did not argue in district court that Hansen had acted negligently.

8

total depth" did not forfeit all outstanding payments under the contract by failing to pay his materialmen or subcontractors or by failing to keep the owner's property free from liens. *Houy*, 486 P.2d at 21. We agree with the district court that the reference to the driller "performing in a workmanlike fashion" was dicta that was not necessary to "the resolution of the specific issue presented." Aplt. App. Vol. 3 at 647-48.

*Samuelson* and *Metropolitan Gas* do not support the proposed instructions either. In *Samuelson*, homeowners who were injured in an explosion sued the gas company that installed their propane system for breach of implied warranty *and negligence* and alleged the explosion was caused by the unworkmanlike installation of the gas line. The Colorado Supreme Court explicitly rejected the notion that implied warranties apply to service contracts, reasoning that such a practice would allow "liability without fault in service contracts." *Samuelson*, 529 P.2d at 633-34; *see also Johnson-Voiland-Archuleta, Inc. v. Roark Assocs.*, 572 P.2d 1220, 1221 (Colo. App. 1977) (reaffirming this rule and applying it to engineering services). The court ultimately limited liability to acts of negligence—stating that experts who enter into a service contract are negligent if they do not discharge their "duty to exercise the ordinary skill and competence of members of their profession" and to exercise "reasonable care and competence." *Samuelson*, 529 P.2d at 633-34 (internal quotation marks omitted). Similarly, the homeowners in *Metropolitan Gas* sued a heating contractor for negligence after a defective heating system caused an explosion in their home. The

9

court concluded that the contractor's contract with the homeowners "gave rise to a common law duty to perform its work with reasonable care and skill." *Metro. Gas*, 621 P.2d at 318.

LKA Gold effectively asks us to import negligence concepts into a breach of contract action in which it did not assert a negligence claim or allege negligent behavior. It repeatedly characterizes the contract for general drilling services as a service contract, and its answer listed a breach of "implied warranties" as a defense, Aplt. App. Vol. 1 at 38. But it now tries to circumvent the rule that implied warranties do not apply to service contracts by speaking in terms of "a duty to exercise reasonable care," Aplt. Opening Br. at 16—terminology, we note, that differs from the contents of the disputed instructions. This approach pushes LKA Gold into negligence and torts territory.[3] The district court did not err in refusing to instruct the jury to apply a negligence standard. Had it done so, it would have crossed the "sometimes blurred boundary between tort law and contract law" that Colorado courts have proactively tried to maintain. *See A.C. Excavating v. Yacht Club II Homeowners Ass'n, Inc.*, 114 P.3d 862, 865 (Colo. 2005).

---

[3] LKA Gold sometimes ignores the tort underpinnings of the above-referenced cases and describes them as contractual disputes. *See, e.g.*, Aplt. Opening Br. at 16-17. Yet it also goes so far as to state that an instruction "should have been given" on "the negligence standard that the Colorado Supreme Court has adopted." *Id.* at 19; *see also id.* at 15-16 (articulating a negligence standard when discussing *Pepsi Cola Bottling Co. v. Superior Burner Service Co.*, 427 P.2d 833 (Alaska 1967)). And it infers that Hansen negligently breached the contract. *See* Aplt. Reply Br. at 2.

Our proper focus is upon Colorado contracts law, which does not impose the duty articulated in either rejected instruction. "The law relating to drilling contracts is not different from the general law of contracts when the issue of performance, discharge and breach of contract is compared." *Houy*, 486 P.2d at 21. Therefore, "[i]f the parties wanted [Hansen] to be held to a specific standard of care, they were free to include such a standard as a term of the contract." *BSLNI, Inc. v. Russ T. Diamonds, Inc.*, 293 P.3d 598, 603 (Colo. App. 2012). "Absent an agreement by the parties to abide by an industry standard of care, we will not read such a standard of care into the contract." *Id.* "Contract law is intended to enforce the expectancy interests created by the parties' promises so that they can allocate risks and costs during their bargaining." *Town of Alma v. AZCO Constr., Inc.*, 10 P.3d 1256, 1262 (Colo. 2000).

In keeping with these principles, Colorado courts have been reluctant to expand the scope of implied duties beyond those already recognized. The only clearly recognized implied duty applicable here is the duty of good faith and fair dealing. *See City of Golden v. Parker*, 138 P.3d 285, 292 (Colo. 2006) ("Under Colorado law, every contract contains an implied duty of good faith and fair dealing."). "The good faith performance doctrine is generally used to effectuate the intentions of the parties or to honor their reasonable expectations." *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995), *as modified on denial of reh'g* (Jan. 16, 1996). It ensures "faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." *Id.* (internal quotation marks omitted). It is not, however, a means to "inject new

11

substantive terms into a contract or change its existing terms." *Soderlun v. Pub. Serv. Co.*, 944 P.2d 616, 623 (Colo. App. 1997); *accord Miller v. Bank of N.Y. Mellon*, 379 P.3d 342, 348 (Colo. App. 2016) (same).

The disputed instructions are far from "clear, . . . impartial and free from argument," Colo. R. Civ. P. 51.1(2). The district court did not abuse its discretion in refusing to give them to the jury. Furthermore, the jury instructions as a whole accurately informed the jury of the governing law. They fairly addressed the elements of a breach of contract claim for both parties' claims, rather than singling Hansen out for an additional duty as LKA Gold proposed. They explained the requirement of substantial performance and compliance with the essential obligations of the contract, advising the jury to consider "the nature of the promised performance, the purpose of the contract, and whether any defects in the performance . . . defeated the purpose of the contract," Aplt. App. Vol. 1 at 97 (tracking CJI 30:12). They discussed the implied duty of good faith and fair dealing within every contract in a way that mirrors Colorado law:

> Every contract requires the parties to act in good faith and to deal fairly with each other in performing or enforcing the express terms of the contract.
>
> A party performs a contract in good faith when his or its actions are consistent with the agreed common purpose and with the reasonable expectations of the parties. The duty of good faith and fair dealing is breached when a party acts contrary to that agreed common purpose and the parties' reasonable expectations.

*Id.* at 98 (tracking CJI 30:16). And the instruction listing the elements of LKA Gold's counterclaim reiterated the notion of an implied duty by requiring a finding that

12

"Hansen failed to perform his express or implied obligations of the contract," *id.* at 101. We conclude that as a whole the instructions properly guided the jury. We are not persuaded that the absence of the disputed instructions prejudiced LKA Gold.

## B. Damages

LKA Gold also argues the district court erred in denying its motion for JMOL under Federal Rule of Civil Procedure 50(a) as to Hansen's claims for lost profits and consequential damages. We review the district court's ruling de novo, applying the same standard as the district court. *Elm Ridge Expl. Co. v. Engle*, 721 F.3d 1199, 1216 (10th Cir. 2013). That is, we ask whether "a reasonable jury would not have a legally sufficient evidentiary basis to find for the [other] party" on an issue, Fed. R. Civ. P. 50(a)(1).

JMOL is "cautiously and sparingly granted." *Bill Barrett Corp. v. YMC Royalty Co.,* 918 F.3d 760, 766 (10th Cir. 2019) (internal quotation marks omitted). We "may find error in the denial of such a motion only if the evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion; we must construe the evidence and inferences most favorably to the nonmoving party." *Allen v. Wal-Mart Stores, Inc.*, 241 F.3d 1293, 1296 (10th Cir. 2001) (internal quotation marks omitted). In other words, reversal is appropriate "only if the evidence is such that without weighing the credibility of the witnesses the only reasonable conclusion is in the moving party's favor." *Elm Ridge Expl. Co.*, 721 F.3d at 1216 (brackets and internal quotation marks omitted).

13

## 1. Lost Profits

As stated above, Colorado's substantive law governs the analysis of the underlying claims because this is a diversity case. "In a breach of contract action, a plaintiff may recover the amount of damages that are required to place him in the same position he would have occupied had the breach not occurred." *Pomeranz v. McDonald's Corp.*, 843 P.2d 1378, 1381 (Colo. 1993). Lost profits may be awarded for a breach of contract if (1) "they can be proven with reasonable certainty"; and (2) they are a "foreseeable result" of the breach. *Denny Constr., Inc. v. City & Cty. of Denver ex rel. Bd. of Water Comm'rs*, 199 P.3d 742, 746 (Colo. 2009) (internal quotation marks omitted).

For the first requirement, damages may not be "speculative, remote, imaginary, or impossible of ascertainment." *W. Cities Broad., Inc. v. Schueller*, 849 P.2d 44, 50 (Colo. 1993). But reasonable certainty does not mean mathematical certainty. *Pomeranz*, 843 P.2d at 1382. Courts give a plaintiff "a certain amount of leeway" because of the practical difficulties of proving future damages. *Id.* A plaintiff must prove that damages will accrue in the future and present "sufficient admissible evidence [to] enable the trier of fact to compute a fair approximation of the loss." *Id.*; *see, e.g.*, *Denny Constr.*, 199 P.3d at 746 (allowing the jury to assess lost profits through "the best evidence the nature of the case allows" (internal quotation marks omitted)). Often, "the simplest and most obvious method of calculating lost profits is a computation based upon the contract." *Tull v.*

14

*Gundersons, Inc.*, 709 P.2d 940, 945 (Colo. 1985) (internal quotation marks omitted).

In addition, a plaintiff may base anticipated profits on past experiences or on the interruption of an established business. *Lee v. Durango Music*, 355 P.2d 1083, 1087-88 (Colo. 1960).

For the second requirement, "the test of foreseeability is whether, *at the time the parties entered into the contract*, the defendant reasonably could have anticipated from the facts or circumstances" that the plaintiff would incur these damages in the event of a breach. *Denny Constr.*, 199 P.3d at 746 (internal quotation marks omitted).

LKA Gold argues that Hansen cannot recover lost profits as a matter of law because he cannot satisfy the first requirement: proof with reasonable certainty. LKA Gold insists there were too many "unknowns and variables" to "allow a jury to compute a fair approximation of the alleged loss" based on Hansen's testimony. Aplt. Opening Br. at 23. It disputes that Hansen had an established drilling business on which to base lost profits—noting that he had not done any underground drilling since 2007 and that his last surface drilling project was in 2012. It challenges his profit estimates because they were based on varying undocumented assumptions of how much he could have drilled in a day. And it challenges his cost estimates because they necessarily "depended on the conditions he encountered and how his equipment operated." *Id.* at 24.

15

LKA Gold would hold Hansen to a rigid standard of proof that is inconsistent with Colorado law as articulated above. It also applies the wrong standards when it broadly argues that Hansen did not have "sufficient evidence of his lost profits," *id.* at 28, and when it asks us to vacate the verdict because "Hansen's testimony clearly confused the jury," *id.* at 24.[4] The relevant standard is whether "the evidence points but one way and is susceptible to no reasonable inferences supporting" Hansen. *See Allen*, 241 F.3d at 1296 (internal quotation marks omitted). LKA Gold has not shown that is the case. Hansen's trial testimony provided a reasonable estimate of the amount of lost profits he sustained due to LKA Gold's breach of contract.

Hansen testified that he has worked in the mining industry for fifty-six years, including thirty to forty projects as a drilling contractor since 1982. He did not purport to have exact numbers. *See* Aplt. App. Vol. 2 at 349 ("All I have is a good estimate."). Rather, he based his estimate on his experience, stating that he calculated his lost profits "[b]y looking back at records of other drilling contracts that

---

[4] LKA Gold contends the jury must have been confused because the $72,900 verdict corresponds with the amount Hansen would have been paid for drilling the minimum footage under the contract (gross profit)—not with his testimony on the estimated range of lost profits ($70,153 to $79,086) or the invoices for work completed ($37,538.10). Hansen did testify at one point "that the 72,900 accurately reflects what the profit would have been," Aplt. App. Vol. 2 at 335. "We will not disturb a jury's finding on damages unless it is so unreasonable as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption, or other improper cause invaded the trial." *Bennett v. Longacre*, 774 F.2d 1024, 1028 (10th Cir. 1985) (internal quotation marks omitted). This standard has not been met.

16

[he] performed and from [his] memory." *Id.* at 380. Hansen explained in detail how he typically prepares a pre-job estimate to make sure a job will be profitable. He also explained how his estimate for the Golden Wonder Mine assumed that LKA Gold would allow him to drill the contractual minimum at varying daily footage rates. Taking drilling conditions into account, he testified that his expected net profits were $79,086 under an "excellent" drilling scenario, $71,946 under a "fair" drilling scenario, and $70,153 under a "bad" drilling scenario. *Id.* at 218-21. He further testified that he has made up to sixty percent profit on a job—the equivalent to his claim here—on at least one occasion.

Because Hansen's testimony would give a reasonable jury "a legally sufficient evidentiary basis to find for" him, *see* Fed. R. Civ. P. 50(a)(1), the district court correctly denied LKA Gold's motion for JMOL on lost profits. It was then up to the jury to consider Hansen's credibility, the reasonableness of his calculations, and the similarities between the Golden Wonder Mine and his past projects in evaluating the weight of the evidence.

### 2. Other Consequential Damages

The district court also allowed the jury to determine whether Hansen suffered consequential damages. "'[C]onsequential damages' are other foreseeable damages within the reasonable contemplation of the parties at the time the contract was made." *Giampapa v. Am. Family Mut. Ins. Co.*, 64 P.3d 230, 237 n.3 (Colo. 2003). LKA Gold argues that Hansen cannot recover consequential damages as a matter of law

17

because he did not present "sufficient evidence," Aplt. Opening Br. at 25, or prove foreseeability. Here, too, LKA Gold does not apply or meet the standard for reversing a denial of a Rule 50(a) motion.

Hansen testified that he sustained additional damages because LKA Gold's breach of contract led to "a terrible cash flow problem," Aplt. App. Vol. 2 at 222, as reflected in bank statements and invoices that the district court admitted as exhibits. His credit was adversely affected because he had used his credit cards and his line of credit for expenses in his drilling business. And because his bank refused to finance him any longer, he borrowed money from his wife and his inheritance "to keep from going broke." *Id.* at 223. Hansen liquidated equipment and a house at less than their fair market value to raise funds because he "was short money having not gotten paid by LKA." *Id.* at 228. The lack of funds also prevented him from renewing his contractor's license in Nevada, which in turn inhibited his future job prospects. In short, he "was in a spiral not having enough money to pay [his] bills, trying to stay current." *Id.* at 247.

Based on his own experience in mine management, Hansen testified that these hardships and additional damages would be "[a]bsolutely" foreseeable for any contractor whose job is canceled. *Id.* at 222. Lonnie Mollberg, a geologist who worked on this project with Hansen, expressed a similar opinion. Drawing on his

18

experience supervising drilling projects, he testified that when you hire a driller, "you understand what is at stake if a driller doesn't get paid[.]" *Id.* at 397.

This testimony and the supporting exhibits would give a reasonable jury "a legally sufficient evidentiary basis to find for" Hansen on the consequential damages question, *see* Fed. R. Civ. P. 50(a)(1). Therefore, the district court correctly denied LKA Gold's Rule 50(a)(1) motion on that claim. On appeal, we cannot say "the evidence points but one way and is susceptible to no reasonable inferences supporting" Hansen so as to merit reversal. *See Allen*, 241 F.3d at 1296 (internal quotation marks omitted).

### III.    Conclusion

We affirm the district court's amended judgment.

Entered for the Court

Mary Beck Briscoe
Circuit Judge