**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 9, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

ELM RIDGE EXPLORATION
COMPANY, LLC,

     Plaintiff/Counterclaim Defendant -
Appellee/Cross-Appellant,

v.

FRED ENGLE,

     Defendant/Counterclaimant/Third-
Party Plaintiff - Appellant/Cross-
Appellee,

v.

CENTRAL RESOURCES, INC.,

     Third-Party Defendant – Appellee,

and

GIANT EXPLORATION AND
PRODUCTION COMPANY,

     Third-Party Defendant.

Nos. 11-2192, 12-2017, 12-2109

---

**APPEALS FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. NO. 1:10-CV-00328-MCA-LFG)**

---

Michael Newell (Lewis C. Cox, III, with him on the briefs), Heidel, Samberson, Newell, Cox & McMahon, Lovington, New Mexico, appearing for Appellant/Cross-Appellee Fred Engle.

William E. Zimsky, Abadie & Schill, PC, Durango, Colorado, appearing for Appellee Central Resources, Inc., and Appellee/Cross-Appellant Elm Ridge Exploration Company, LLC.

_____

Before **LUCERO**, **MURPHY**, and **MATHESON**, Circuit Judges.

_____

**MATHESON**, Circuit Judge.

_____

This case concerns a dispute between Elm Ridge Exploration Company, LLC ("Elm Ridge"), the operator of certain oil and gas leases in New Mexico, and Fred Engle, the majority owner of the leases. An operating agreement (the "Operating Agreement" or "Agreement") governs their relationship. Elm Ridge seeks to recover costs it incurred in drilling a well on the leasehold property (the West Bisti 22-1T well or "1T" well). Mr. Engle contends, among other things, that he should not have to pay for unauthorized expenses that Elm Ridge incurred.

Their dispute became a diversity action in which Elm Ridge sought to recover drilling expenses by foreclosing on Mr. Engle's lease interests. Mr. Engle counterclaimed, alleging that (1) Elm Ridge had no authority to be the operator ("Count 1"); (2) Elm Ridge conspired to conceal an earlier violation of his right to choose the operator ("Count 2"); and (3) he should receive damages for Elm Ridge's breach of its

-2-

contractual and fiduciary duties ("Count 3"). Mr. Engle also filed a third-party complaint on the conspiracy counterclaim against the previous operators—Central Resources, Inc. ("Central") and Giant Exploration & Production Company ("Giant")—as well as Giant's parent company, Giant Industries. The parties later stipulated to the dismissal of Giant Industries, which the district court granted. Giant Industries is not a party to these appeals. Elm Ridge is the successor in interest to Giant.

In response to Elm Ridge's motion for summary judgment and Central's motion to dismiss, the district court dismissed Counterclaim Counts 1 and 2 and the third-party complaint on statute of limitations grounds. After a three-day trial on Counterclaim Count 3, a jury found that Elm Ridge had breached the Operating Agreement and could not recover the costs attributable to the breach from Mr. Engle. The jury found that Mr. Engle still owed Elm Ridge for other drilling costs. Relying on the jury's findings, the district court calculated Mr. Engle's share of the costs not attributable to the breach and held that Elm Ridge was entitled to a foreclosure order. Both parties appeal.

On appeal, Mr. Engle argues that the district court erred in (A) granting Elm Ridge's and Central's motions for summary judgment and dismissal of Counterclaim Counts 1 and 2 and the third-party complaint; (B) not excusing his share of the drilling costs despite Elm Ridge's breach of the Operating Agreement; and (C) excluding other acts evidence regarding Elm Ridge.

On cross-appeal, Elm Ridge argues that the district court erred in (D) denying its Rule 50(a), 59(a), and 59(e) motions under the Federal Rules of Civil Procedure regarding Counterclaim Count 3; and (E) submitting the damages issue of Counterclaim Count 3 to a jury rather than deciding it from the bench.

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.     BACKGROUND

### A.     *Factual Background*

#### 1.     Leasehold Interests

Elm Ridge and Mr. Engle own working interests in federal oil and gas leases in New Mexico. A working interest owner has the right to explore and develop the lease for oil and gas and generally pays the costs of drilling and completing a well. *See Ryan v. Am. Natural Energy Corp.*, 557 F.3d 1152, 1163 (10th Cir. 2009); *Strata Prod. Co. v. Mercury Exploration Co.*, 916 P.2d 822, 825 n.1 (N.M. 1996). By contrast, a royalty interest owner does not have the right to explore or develop the lease, does not pay for oil and gas production costs, and receives royalty payments as a percentage of oil and gas production. *See Atlantic Ref. Co. v. Beach*, 436 P.2d 107, 111 (N.M. 1968).

When there are two or more working interest owners of a lease, one of the owners may propose a new well in the leasehold area, and the other(s) may elect to participate ("consenting owner(s)") or not to participate ("non-consenting owner(s)"). *See San Juan Basin Consortium, Ltd. v. EnerVest San Juan Acquisition Ltd. P'ship*, 67 F. Supp. 2d

-4-

1213, 1214 (D. Colo. 1999). The consenting owners, because they pay the costs of completing the new well, receive the non-consenting owners' share of production from the new well until they have recovered a contractually determined percentage of the costs, here 200 percent.

2.      **Agreement with Giant**

On November 2, 1992, Mr. Engle and Giant entered into an oil and gas Operating Agreement that combined two oil and gas leases owned by Mr. Engle and two leases owned by Giant into a single contract area in San Juan County, New Mexico. Mr. Engle owned 62.5 percent of the working interest in the contract area, and Giant owned the other 37.5 percent. Under the Agreement, Giant was designated as the operator—the party who would operate the leases and any wells drilled on the land.

The Operating Agreement provided that the

> Operator may resign at any time by giving written notice thereof to Non-Operators. If Operator terminates its legal existence, no longer owns an interest hereunder in the Contract Area, or is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor. . . .
>
> Upon the resignation or removal of Operator, a successor Operator shall be selected by the parties. The successor Operator shall be selected from the parties owning an interest in the Contract Area at the time such successor Operator is selected. The successor Operator shall be selected by the affirmative vote of two (2) or more parties owning a majority interest . . . .

Aplt. Appx. at 405.

Pursuant to the Agreement, Giant drilled and completed the first well, known as the West Bisti 22 Coal 22-1 well (the "22-1" well), within the contract area.

3.    **Purchase by Central**

On August 30, 1996, Giant sent a letter to Mr. Engle, stating:

> Re: Notice of Contract Operating Agreement
> Ladies and Gentlemen:
> . . . Giant has entered into a contract operating agreement . . . with Central . . . in connection with [the properties described in an attached exhibit]. In accordance with the Contract Operating Agreement, Central will perform (on behalf of Giant) Giant's obligations as operator . . . . Giant hereby requests and authorizes you to submit all correspondence, payments and other information to Central that you are presently submitting to Giant pursuant to the governing operating agreement.

Aplt. App. at 210.

That same day, Central filed a notice with the Bureau of Land Management ("BLM") that Giant had resigned as operator and that the working interest owners—who were Mr. Engle and Central—had designated Central as operator.

On September 30, 1996, Central sent Mr. Engle a letter about Central's revenue distribution policies. The letter stated:

> Dear Working Interest and/or Royalty Owner:
> Effective April 1, 1996, Central Resources, Inc. ("Central")
> purchased certain oil and gas properties in Colorado, Kansas,

New Mexico, Oklahoma and Utah owned by Giant Exploration and Production and assumed operatorship of those properties on September 1, 1996.

Aplt. Appx. at 214.

4.      **Purchase by Elm Ridge**

On September 29, 2000, Central bought all of Giant's issued and outstanding stock

from Giant Industries.  The same day, Central assigned and transferred all the Giant

stock, including its interests in the contract area, to Elm Ridge.[1]

Central sent a letter, dated September 29, 2000, to Mr. Engle, stating the change of

ownership and operatorship:

> TO: JOINT WORKING INTEREST OWNERS
> NOTICE OF CHANGE OF OPERATORSHIP/OWNERSHIP
> Ladies and Gentlemen:
> Our records indicate that you currently own a working interest in each of the properties described on the attached Exhibit (the "Properties"), which Properties were operated by Central Resources, Inc.  Effective June 1, 2000 . . . , Central transferred its interest in the Properties to Elm Ridge . . . .  Effective October 1, 2000 . . . , *Central resigns as Operator and Elm Ridge assumes operatorship of the Properties*.

Aplt. Appx. at 253 (emphasis added).  An attached exhibit identified Mr. Engle as a

---

[1] Central transferred the shares to Elm Ridge Resources.  By the same assignment, Elm Ridge Resources transferred all the shares to Elm Ridge Exploration Company, a limited partnership whose general partner was Elm Ridge Resources.  Both Elm Ridge Resources and Elm Ridge Exploration will be referred to as "Elm Ridge."

working interest owner of the affected property.

On October 1, 2000, Elm Ridge sent a notice to the BLM stating that Central had resigned as operator and that the working interest owners—which included Mr. Engle—had designated Elm Ridge as successor operator.

5.    **Drilling the 1T Well**

In June 2005, Elm Ridge sent Mr. Engle written notice of its intent to drill the 1T well. Mr. Engle elected to participate and signed the cost estimate ("authorization of expenditure") on June 14, 2005. The Operating Agreement required that Elm Ridge begin drilling the well within 90 days or it would have to seek Mr. Engle's consent again. Elm Ridge needed a permit from the BLM because Mr. Engle's and Elm Ridge's leases were federal leases, and it needed a permit from the Navajo Nation because it owned the surface where the well was to be drilled. Elm Ridge did not obtain the permits within 90 days of Mr. Engle's consent, but it continued to pursue the permits.

By certified letter dated July 8, 2008, Elm Ridge notified Mr. Engle that it was proposing again to drill the new well after a lengthy permitting process. It attached a new authorization for expenditure and asked Mr. Engle to elect whether he wanted to participate.

On August 25, 2008, Mr. Engle responded, expressing surprise that the estimated costs had increased from $188,581 in 2005 to $559,000. He asserted that Elm Ridge's

lack of diligence contributed substantially to the increased cost and that he lacked confidence in Elm Ridge's reliability as operator of the new well. He therefore elected to take non-consent status.

After a series of phone calls and letters discussing the penalty in the Operating Agreement for electing not to participate, Mr. Engle sent Elm Ridge a letter on September 13, 2008. He stated that he now elected to participate but demanded as majority working interest owner that Elm Ridge postpone any new activity until the market normalized and costs declined. He stated that he would take legal action if Elm Ridge harmed his interests. Elm Ridge responded that same day, acknowledging that he had elected to participate.

To fulfill permitting requirements, Elm Ridge had already spudded the well, which means that it had commenced the drilling operations, in August 2008. The Operating Agreement states that the operator may use its own tools and equipment to drill wells. It requires, however, that the operator's charges for using its own equipment not exceed prevailing rates in the area and that the operator's rates be agreed to in writing before drilling commenced. Without Mr. Engle's consent, Elm Ridge contracted with one of its affiliates—Triple P Oilfield Services ("Triple P")—to do the major part of drilling the well.

Triple P brought a rig to the site in October 2008 and completed the drilling on

November 12, 2008.  Although the authorization of expenditure to drill specified the use of a 24-hour rig, Triple P used a daylight rig.  A 24-hour rig is a heavy-duty rig that can run 24 hours a day, is equipped with a lighting system, and can drill deeper than a daylight only rig.  It also can cost less to operate than a daylight rig.

## B. *Procedural Background*

### 1. **Elm Ridge's Complaint and Mr. Engle's Counterclaim and Third-Party Action**

On January 7, 2010, Elm Ridge filed a complaint for foreclosure of real property against Mr. Engle in the San Juan County, New Mexico, district court.[2]  Elm Ridge asserted that Mr. Engle had defaulted on his obligation to pay his share of the drilling expenses.  By the terms of the Operating Agreement, Mr. Engle granted to the operator a lien on his interests in the wells, his oil and gas leases within the contract area, and his real property within the contract area.  He also granted the operator a security interest in all oil and gas extracted from the contract area, and in all machinery, equipment, and personal property connected with the contract area.  Elm Ridge sought foreclosure on those liens to satisfy Mr. Engle's alleged debts.

---

[2] Mr. Engle had previously filed a complaint against Central and Elm Ridge in the United States District Court for the District of South Dakota, but the district court dismissed the action on July 29, 2009, for lack of personal jurisdiction and subject matter jurisdiction.

In April 2010, Mr. Engle removed the case to federal district court, filed his answer to Elm Ridge's complaint and a counterclaim for declaratory relief and damages, and filed a demand for a jury trial.

On September 14, 2010, Mr. Engle filed a combined amended answer to Elm Ridge's complaint, a three-count counterclaim against Elm Ridge, and a third-party complaint adding Central, Giant, and Giant Industries (Giant's former parent company) as third-party defendants.

Count 1 of the counterclaim sought (1) a declaration that Elm Ridge was not an authorized operator under the Operating Agreement, (2) a judgment disgorging Elm Ridge of excess payments it received from the working interest owners, and (3) damages for Elm Ridge's unauthorized conduct as operator, including its drilling of the 1T well.

Count 2 alleged a conspiracy in September 2000 among Elm Ridge, Central, Giant, and Giant Industries to conceal Central's failure in 1996 to follow the Operating Agreement's procedures for electing a successor operator to Giant. In the third-party complaint, associated with Count 2, he sought damages from Giant, Giant Industries, and Central for their involvement in the conspiracy.

Count 3 alleged that, if Elm Ridge had legitimately assumed the operatorship, it had breached its contractual and fiduciary duties to Mr. Engle. During the course of litigation, Mr. Engle alleged that Elm Ridge breached these duties by using its own

equipment and a more expensive rig than that listed in the authorization for expenditure, both without his permission. In particular, Mr. Engle alleged that Elm Ridge used its affiliate's more expensive daylight rig rather than waiting for a 24-hour rig to become available because it knew that he, as majority working interest holder, would pay most of the extra cost to Elm Ridge's affiliate and that Elm Ridge would thereby profit. Mr. Engle therefore claimed as damages the extra costs of using Triple P's daylight rig in violation of the Operating Agreement.

2.      **Motions for Dismissal and Summary Judgment**

On November 16, 2010, Central moved to dismiss the third-party complaint against it. On January 5, 2011, Elm Ridge moved for summary judgment on the counterclaims against it and, as successor in interest to Giant, the third-party complaint against Giant.

On August 29, 2011, the district court granted in part and denied in part Elm Ridge's motion for summary judgment. It also granted Central's motion to dismiss the third-party complaint. As to Counterclaim Count 1, the court concluded that a state statute of limitations began to run on September 29, 2000, and that it expired in September 2006. As to Counterclaim Count 2 and the third-party complaint, it concluded that a state statute of limitations expired in 2004. The court denied Elm Ridge's summary judgment motion as to Count 3 of the counterclaim, rejecting Elm Ridge's

-12-

argument that it had no fiduciary duty to Mr. Engle.  All that was left of Mr. Engle's

counterclaims was Count 3—his breach of contract and breach of fiduciary duty claim

against Elm Ridge.

3.     **Motion for a Bench Trial on Remaining Issues**

At an October 6, 2011 hearing, the district court heard Elm Ridge's argument that

the remaining issues—its foreclosure claim against Mr. Engle and Mr. Engle's breach of

contract and breach of fiduciary duty counterclaim against Elm Ridge—should be tried

by the court rather than a jury.  The district court held that the breach issue under

Counterclaim Count 3 was an issue for the jury.

4.     **Evidentiary Motions In Limine**

On September 26, 2011, Elm Ridge filed four motions in limine to exclude

evidence that Mr. Engle wanted to present at trial.  Only two of them are at issue on

appeal:  evidence that Elm Ridge (1) breached the Operating Agreement in 2000 by

ignoring the requirements for election of a new operator;[3] and (2) misrepresented to the

BLM that all the working interest owners had designated it as the operator.

On October 9, 2011, the trial court granted the motions.  The court agreed that

evidence of a prior breach provided only weak proof of willful misconduct for the breach

_____

[3] The motion in limine and the district court's order granting the motion did not
state what this evidence was.

alleged in Counterclaim Count 3, and it therefore concluded that the evidence should be excluded under Federal Rule of Evidence 403 because the probative value was substantially outweighed by the risk of confusing the jury. It also excluded the breach evidence as character propensity evidence under Rule 404(b). For the same reasons, the district court excluded the evidence about Elm Ridge's representation to the BLM.

5.      **Trial, Rule 50(a) Motion, and the Verdict**

As discussed above, although Elm Ridge asked the district court to decide Mr. Engle's counterclaim for damages rather than submit it to a jury, the court determined that a jury should decide the damages claim. Trial was held from October 11 to October 13, 2011. After the close of evidence, Elm Ridge moved for judgment as a matter of law under Rule 50(a), arguing that there was no evidentiary foundation for Mr. Engle's alleged damages. It argued that Mr. Engle had not shown that he was damaged by the use of a daylight rig rather than a 24-hour rig. Without stating its reasons, the district court rejected the motion.

Later that day, the jury rendered a verdict. On a special verdict form, it found that Mr. Engle had consented to the drilling of the new well. It also found that Elm Ridge had committed a substantial, but not a material, breach of the Operating Agreement by using a more expensive daylight rig and by using its own equipment without Mr. Engle's consent. It further found that, out of total claimed drilling costs of $312,516.31, a

-14-

reasonably prudent operator would have incurred $235,167.31 in costs and that Elm

Ridge's breach had thereby increased the costs of drilling the new well by $77,349.

On January 27, 2012, the district court filed its findings of fact and conclusions of

law to address the foreclosure action.[4] The court noted that it had "considered the

evidence presented at the trial . . . and [was] deferring to the findings made by the jury."

Aplt. Appx. at 558. The court found that Mr. Engle elected to participate in the drilling

of the well, that the Operating Agreement required that the parties pay the costs of

operations in proportion to their interests, that Elm Ridge had a 37.5% interest and Mr.

Engle had a 62.5% interest, that Elm Ridge's substantial but non-material breach had

increased the cost of drilling by $77,349.00, and that Elm Ridge incurred $235,167.31 in

expenses for the work completed in a good and workmanlike manner. After making

deductions for amounts Mr. Engle had already paid and for revenues from the 22-1 well

Elm Ridge had withheld from Mr. Engle, the court concluded that Mr. Engle owed Elm

Ridge $116,876.58, plus $13,765.45 in prejudgment interest. It also concluded that,

according to the terms of the Operating Agreement, Elm Ridge was entitled to an order

---

[4] Under either federal or New Mexico law, a foreclosure is an action in equity, which must be decided by the court rather than a jury. *See Mile High Indus. v. Cohen*, 222 F.3d 845, 856 (10th Cir. 2000); *Evans Fin. Corp. v. Strasser*, 664 P.2d 986, 987 (N.M. 1983). Therefore, after the jury had entered its findings about the legal issues in the case, the court entered its ruling on the equitable issues.

foreclosing on the lien against Mr. Engle's right, title, and interest to the oil and gas leases, the wells, and the real property within the contract area.

Also on January 27, 2012, the district court entered its final order of judgment.

6. **Elm Ridge's Rule 59(a) Motion for a New Trial and 59(e) Motion to Amend Judgment**

On February 24, 2012, Elm Ridge filed a motion to amend the judgment under Federal Rule of Civil Procedure 59(e) or grant a new trial under Rule 59(a), limited to the question of Mr. Engle's damages. It argued that, under New Mexico law, there was insufficient evidence to prove damages owed to Mr. Engle with reasonable certainty, and therefore its award should include the $77,349 in costs the jury found Elm Ridge had incurred by using the daylight rig in breach of the Operating Agreement.

On June 19, 2012, the district court denied Elm Ridge's motion. The court concluded that amending the judgment and awarding Elm Ridge an amount greater than that awarded by the jury would constitute additur and thus a reexamination of a jury's verdict in violation of the Seventh Amendment.

Turning to the request for a partial new trial on the damages issue, the court noted that under New Mexico law a jury's assessment of damages is largely inviolate and shall not to be disturbed except in extreme cases, such as when the jury's award shocks the conscience because it is not supported by substantial evidence. The district court concluded that substantial evidence supported the verdict and denied the motion.

-16-

\* \* \*

On September 28, 2011, Mr. Engle appealed from the order dismissing the third-party complaint.[5]  On February 8, 2012, Mr. Engle filed a notice of appeal regarding the district court's summary judgment order, the two motions in limine, and the court's final judgment.  Elm Ridge filed a notice of its cross-appeal on July 2, 2012, and an amended notice of appeal on July 5, 2012.

## II.    **DISCUSSION**

Mr. Engle argues that the district court erred in (A) concluding that Counterclaim Counts 1 and 2 and the third-party complaint were time-barred; (B) not excusing him

---

[5] "In general a party may not appeal until entry of a final order."  *Fields v. Okla. State Penitentiary*, 511 F.3d 1109, 1111 (10th Cir. 2007); *see* Fed. R. Civ. P. 54(b) (When an order does not dispose of all claims for relief or the liability of all parties, a district court may enter final judgment as to only some of the claims or parties "only if the court expressly determines that there is no just reason for delay.").  Because Mr. Engle filed this notice of appeal before the district court entered final judgment, it was a premature notice of appeal as to the dismissal order.  "A premature notice of appeal may ripen, however, upon entry of a subsequent final order, so long as the order leading to the premature notice of appeal has some indicia of finality and is likely to remain unchanged during subsequent court proceedings."  *Fields*, 511 F.3d at 1111 (citations omitted).  Because these conditions are satisfied here, we have jurisdiction to review the district court's dismissal order.

Because Mr. Engle filed a second notice of appeal after the court's final order, we have jurisdiction to consider his appeal of issues based on the court's other orders.  *See B. Willis, C.P.A., Inc. v. BNSF Ry. Corp.*, 531 F.3d 1282, 1295 (10th Cir. 2008) (holding that second notice of appeal, filed after entry of final judgment, is necessary for appellate jurisdiction over decisions made after the filing of a premature notice of appeal).

-17-

from paying for any drilling costs; and (C) excluding other acts evidence regarding Elm Ridge.

Elm Ridge argues that (D) because Mr. Engle presented insufficient evidence to prove damages, the district court erred in denying its Rule 50(a) motion for judgment as a matter of law and in denying its motion to grant a new trial under Rule 59(a) or to amend judgment under Rule 59(e).  It also argues that (E) the district court erred in submitting Counterclaim Count 3 to a jury rather than deciding it from the bench as a matter incidental to a foreclosure action.  We address these issues in turn.

## A.    *Statute of Limitations*

Mr. Engle argues that the district court incorrectly granted, on statute of limitations grounds, Elm Ridge's summary judgment motion and Central's motion to dismiss regarding Counterclaim Counts 1 and 2 and Mr. Engle's third-party complaint. "We review the district court's grant of summary judgment de novo, applying the same standards that the district court should have applied." *Jarvis v. Potter*, 500 F.3d 1113, 1120 (10th Cir. 2007).  We review de novo a Rule 12(b)(6) dismissal. *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009).

A federal court sitting in diversity applies the substantive law of the state where it is located, including the state's statutes of limitations. *Burnham v. Humphrey Hospitality Reit Trust, Inc.*, 403 F.3d 709, 712 (10th Cir. 2005).  We must also apply the state's

-18-

"tolling rules, as they are an integral part of the several policies served by the statute of limitations." *State Farm Mut. Auto. Ins. Co. v. Boellstorff*, 540 F.3d 1223, 1228 (10th Cir. 2008) (quotations omitted).

Count 1 of Mr. Engle's counterclaim—that Elm Ridge did not follow the proper procedures under the Operating Agreement to become operator—is a contract claim. Under New Mexico law, actions founded upon a written contract must be brought within six years. N.M. Stat. Ann. § 37-1-3. Count 2 of his counterclaim, as well as the third-party complaint against Giant and Central, asserted civil conspiracy—that Elm Ridge, Giant, Giant Industries, and Central conspired to conceal Central's failure to follow the proper procedures to elect Central as operator in 1996. A four-year statute of limitations applies to civil conspiracy claims under New Mexico law. *Id.* at § 37-1-4.

The date from which the statute of limitations begins to run may be extended by New Mexico's discovery rule, under which a "cause of action does not accrue until the plaintiff discovers" the injury. *Wilde v. Westland Dev. Co.*, 241 P.3d 628, 635 (N.M. Ct. App. 2010). "[D]iscovery is defined as the discovery of such facts as would, on reasonable diligent investigation, lead to knowledge of [the] . . . injury." *Id.* (quotations omitted). "[A] reasonable-person standard will be applied as to whether [a plaintiff] should have known of the [injury]." *Id.* (quotations omitted).

-19-

A plaintiff invoking the discovery rule must "demonstrate that if she had diligently investigated the problem she would have been unable to discover the cause of her injury." *Martinez v. Showa Denko, K.K.*, 964 P.2d 176, 181 (N.M. 1998); *see also Blea v. Fields*, 120 P.3d 430, 440 (N.M. 2005) (holding that to toll statute of limitations for fraudulent concealment, plaintiff must prove that she "lacked knowledge of her cause of action and could not have discovered it by exercising reasonable diligence during the statutory period"). A plaintiff has this burden to defeat either a motion for summary judgment or a motion to dismiss. *Butler v. Deutsche Morgan Grenfell, Inc.*, 140 P.3d 532, 539 (N.M. Ct. App. 2006).

We remind the reader that Elm Ridge filed its claim and Mr. Engle filed his counterclaims in 2010.

1.     **District Court's Orders**

   a.     *Counterclaim Count 1— Violation of Contractual Right to Elect Operator in 2000*

The district court stated that the statute of limitations begins to run under New Mexico law when the plaintiff knows or should know relevant facts that are sufficient to establish a cause of action. *See Delta Automatic Sys., Inc. v. Bingham*, 974 P.2d 1174, 1180-81 (N.M. Ct. App. 1998). The court then discussed the multiple letters Mr. Engle received about changes in operatorship leading up to Elm Ridge's assumption of operator duties.

The district court found that "Central's September 29, 2000 letter clearly informs the reader that Central had transferred its interest in the [22-1 well] to Elm Ridge and that Elm Ridge would assume the role of Operator." Aplt. Appx. at 409. The court therefore concluded that a reasonable jury would necessarily find that by September 29, 2000, Mr. Engle had all the facts necessary to know or to discover through reasonable diligence that Central had sold its interests and that Elm Ridge was assuming the role of Operator. The statute of limitations for any contract claim based on Elm Ridge's assumption of the role of operator therefore had expired in September 2006.

b.    *Counterclaim Count 2 and Third-Party Complaint—Conspiracy in 2000 to Conceal Violation of the Right to Elect an Operator in 1996*

The district court found that Mr. Engle knew by September 29, 2000, that (1) Giant claimed to have transferred to Central, and (2) Central had transferred to Elm Ridge, Giant's interests in the contract area. The court also found that Mr. Engle knew that Elm Ridge had taken over the operatorship from Central. The court concluded that this was sufficient information to put a reasonable person on notice that Central had previously been the operator, that Central had failed to follow the Operating Agreement's election procedures when it assumed the operatorship in 1996, and that the parties allegedly attempted to conceal that failure in 2000. The four-year statute of limitations therefore had expired in 2004.

The district court concluded that, for the same reason, the statute of limitations on

-21-

the third-party conspiracy claim against Giant and Central had expired before Mr. Engle filed his third-party complaint. The district court therefore granted (1) Elm Ridge's summary judgment motion regarding Counterclaim Count 2 and the third-party complaint against Giant and (2) Central's motion to dismiss regarding the third-party complaint.

In denying Mr. Engle's later motion to reconsider, the district court added that, even if there had been fraudulent concealment, New Mexico's doctrine of fraudulent concealment would not excuse Mr. Engle's failure to act on the information available to him.

2.  **Analysis**

Mr. Engle argues that New Mexico's discovery rule is more lenient when fraudulent concealment is involved, and he points to alleged material misrepresentations by Central and Elm Ridge. The statute of limitations should therefore have been tolled, according to Mr. Engle, until he discovered those misrepresentations in 2008, and the 2010 filing of his counterclaims would then be within the time allowed by the statutes of limitations.

For substantially the same reasons as the district court explained, we conclude that Mr. Engle has not demonstrated that if he had exercised reasonable diligence he would not have been able to discover the cause of his injury. *Blea*, 120 P.3d at 440; *Martinez*, 964 P.2d at 181. He therefore has failed to demonstrate there is a genuine issue of

material fact as to whether the statutes of limitations were equitably tolled.  We affirm the

district court's rulings on Count 1 and Count 2 of Mr. Engle's counterclaim against Elm

Ridge and on the third-party complaint against Giant and Central.[6]

> B.     ***Denial of Request to Excuse Mr. Engle's Non-Performance***

Mr. Engle argues that the district court should have excused him from paying any

costs for drilling the 1T well under Elm Ridge's foreclosure claim because Elm Ridge

breached the Operating Agreement.

1.     **District Court's Rulings**

In its findings of fact and conclusions of law, the district court stated, "Although

Elm Ridge committed non-material breaches of the Operating Agreement, it did not

engage in the type of reprehensible conduct that would justify the Court in denying Elm

---

[6] We note that, in deciding the motions for summary judgment and to dismiss together, the district court included materials beyond the pleadings in its analysis of Central's motion to dismiss.  Because the district court considered the motions together and included matters outside the pleadings in its analysis, we consider both Central's and Elm Ridge's motions as motions for summary judgment. *See Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007) (holding that appellate courts can implicitly convert motions to dismiss to summary judgment motions when district courts fail to do so explicitly); 5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1366 (3d ed. 2013).  Mr. Engle had sufficient opportunity to address these materials in his response to the summary judgment motion. *See Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir. 1991).  Central's motion to dismiss dealt with the same issues as Elm Ridge's summary judgment motion.  The district court's failure to convert Central's motion was harmless and does not affect our analysis.

Ridge equitable relief under the doctrine of unclean hands." Aplt. Appx. at 563.

2.      **Analysis**

New Mexico courts have excused a non-breaching party's performance for the other party's material breach in ordinary, arm's length relationships. *See*, *e.g.*, *Gilmore v. Duderstadt*, 961 P.2d 175, 181 (N.M. Ct. App. 1998). Mr. Engle argues that excuse of performance should be extended to a substantial, though not material, breach of a contract when there is a fiduciary relationship between the parties. That is, he argues that the district court should have discharged his obligation, as the non-breaching party, to pay his share of the drilling expenses because of the fiduciary nature of the operator relationship.

Elm Ridge responds that Mr. Engle cannot raise this argument on appeal because he did not raise it before the district court. It notes that the parties agreed to a jury instruction that material breach would discharge Mr. Engle of performance; the instruction did not include discharge of performance for substantial breach.

Because Mr. Engle has not demonstrated that he gave the district court the opportunity to determine whether substantial breach—as opposed to material breach— would discharge his duty of performance, he has forfeited the right to raise this argument on appeal. *See United States v. Gould*, 672 F.3d 930, 938 (10th Cir. 2012) ("'[F]ailure to raise an argument before the district court generally results in forfeiture on appeal.'"

-24-

(quoting *United States v. Jarvis*, 499 F.3d 1196, 1201 (10th Cir. 2007))).  "[W]e have

exercised our discretion to hear issues for the first time on appeal only in the most

unusual circumstances."  *Lyons v. Jefferson Bank & Trust*, 994 F.2d 716, 721 (10th Cir.

1993).  Such unusual circumstances do not exist here.

## C.    *Exclusion of Other-Acts Evidence*

Mr. Engle argues that the district court abused its discretion in excluding evidence

under Rule 403 of the Federal Rules of Evidence.[7]

"We review evidentiary rulings for an abuse of discretion, and pay deference to

the trial court's familiarity with the case and experience in evidentiary matters."

*Abraham v. BP Am. Prod. Co.*, 685 F.3d 1196, 1202 (10th Cir. 2012); *see also*

*Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 384 (2008).  "We reverse only if

the district court's conclusion is arbitrary, capricious, whimsical or manifestly

unreasonable or when we are convinced that the district court made a clear error of

judgment or exceeded the bounds of permissible choice in the circumstances."  *United*

*States v. Avitia-Guillen*, 680 F.3d 1253, 1256 (10th Cir. 2012) (quotations omitted), *cert.*

*denied*, 133 S. Ct. 466 (2012); *see also United States v. Nickl*, 427 F.3d 1286, 1300 (10th

---

[7] The district court also held that the evidence was inadmissible under Rule
404(b).  Because we affirm under Rule 403, we do not address the district court's
analysis or Mr. Engle's arguments regarding Rule 404(b).

Cir. 2005).

Rule 403 states, "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

1.    **District Court's Discussion**

At trial, Mr. Engel sought to admit evidence that (1) Elm Ridge had previously violated the Operating Agreement by assuming the role of operator in 2000 without his agreement and (2) Elm Ridge had falsely notified the BLM in 2000 by letter that he had agreed to its assumption of the operatorship. Mr. Engle argued this evidence was probative that Elm Ridge's breach of the Operating Agreement in 2008 was willful. The district court excluded this evidence.

The court acknowledged that Elm Ridge had unilaterally assumed the role of operator in 2000 without following the procedures in the Operating Agreement. It noted, however, that the Operating Agreement required that the successor operator be one of the working interest owners—either Mr. Engle or Elm Ridge—and that Mr. Engle had not shown that he was capable of or willing to become the operator. The court concluded that "Elm Ridge assumed what would have appeared to have been a foregone conclusion under the Operating Agreement: Elm Ridge would become the successor Operator by

-26-

default." Aplt. Appx. at 540.

Based on this inference about Elm Ridge, the court concluded that the prior breach was only weak evidence that Elm Ridge willfully violated Mr. Engle's rights when it used the daylight rig in 2008. Under Rule 403, the court said, the "scant probative value of this evidence on the issue of willfulness is substantially outweighed by the risk of embroiling the jury in a side issue that will consume valuable time, confuse the jury, and distract the jury from the important issues in this case." *Id.*

For the same reasons, the district court excluded the evidence that Elm Ridge falsely represented to the BLM that the working interest owners had designated Elm Ridge as operator.

2. **Mr. Engle's Arguments**

Mr. Engle argues that the trial court erred in its application of Rule 403 in three ways. First, he argues the district court determined Elm Ridge's mental state without any supporting evidence when it concluded that Elm Ridge assumed that it was a "foregone conclusion" that it would become the operator.

Second, he argues it was not a foregone conclusion that Elm Ridge would become the operator because he could have transferred a portion of his working interest to another entity capable of acting as operator. With his majority interest, he could then have made the other entity the operator. Because it was therefore not a foregone conclusion that Elm

Ridge would take over as operator, he argues, the district court erred in finding that only a weak inference of willfulness could be drawn from the evidence.

Third, Mr. Engle argues that the district court erred in the Rule 403 balancing analysis when it characterized this as a side issue. It was not a side issue, according to Mr. Engle, because the evidence demonstrates Elm Ridge's willingness to ignore the Operating Agreement's requirements and to conceal the violation of Mr. Engle's rights under the Agreement. He argues that this evidence shows that Elm Ridge would be more likely to deprive him of his right to consent to Elm Ridge's use of its own equipment in drilling the well and therefore that it willfully breached the Operating Agreement in 2008.

Beyond stating that Elm Ridge's statement to the BLM would have bolstered his case that Elm Ridge acted willfully when it breached the Operating Agreement in 2008, Mr. Engle fails to address how the district court erred in excluding the BLM evidence.

3.    **Analysis**

We agree with the district court that evidence about Elm Ridge's earlier breach of the Operating Agreement and its letter to the BLM would likely have been confusing and distracting to a jury.[8] The evidence would have led the jury to speculate about the

_____

[8] As noted above, Mr. Engle has not separately developed the argument on appeal as to the BLM evidence. *See United States v. Abdenbi*, 361 F.3d 1282, 1289 (10th Cir. Continued . . .

-28-

validity of claims no longer before the court—that Elm Ridge breached the contract in 2000 by unilaterally assuming the operatorship (Counterclaim Count 1) and that it conspired in 2000 to conceal Central's unilateral assumption of the operatorship in 1996 (Counterclaim Count 2 and third-party complaint).

Moreover, as to probative value, the district court's focus was on the strength of this evidence in demonstrating Elm Ridge's willfulness, not on Mr. Engle's options to control operations. Mr. Engle has not demonstrated that Elm Ridge would have thought that anyone else assuming the operatorship would have been likely. The operator had to be a working interest holder under the Operating Agreement. No evidence was presented that Mr. Engle, as the only other working interest holder at that time, wanted or was able to become operator. The district court correctly concluded that the evidence at issue provided only weak evidence that Elm Ridge willfully violated Mr. Engle's rights in 2008 and that the probative value of the evidence was therefore substantially outweighed by the other Rule 403 concerns.

_____

Cont.

2004). Because the district court excluded that evidence for the same reason as the evidence of Elm Ridge's earlier breach, we review together the district court's decisions excluding both types of evidence.

Mr. Engle has failed to demonstrate that the district court's conclusions were "arbitrary, capricious, whimsical or manifestly unreasonable or" that it "exceeded the bounds of permissible choice in the circumstances." *Avitia-Guillen*, 680 F.3d at 1256 (quotations omitted). The district court therefore did not abuse its discretion.

### D.     *Elm Ridge's Rule 50(a) and Rule 59(a) and (e) Motions*

Before wading into the procedural issues we face in reviewing the district court's treatment of Elm Ridge's motion for judgment under Rule 50(a), motion for new trial under Rule 59(a), and motion for amendment of the judgment under Rule 59(e), we offer a brief overview of the underlying issue. Elm Ridge incurred expenses to drill the 1T well and brought its foreclosure action to recover a share of those expenses from Mr. Engle. Mr. Engle counterclaimed, alleging that Elm Ridge breached the Operating Agreement by using the more expensive daylight rig of Elm Ridge's affiliate to drill the well without his consent. He claims the excess cost of the daylight rig as damages, which would in turn reduce the amount he owes to Elm Ridge for his share of the overall cost of drilling the well.

Although the district court determined that Mr. Engle owes Elm Ridge for drilling expenses, the jury found that Elm Ridge breached the Agreement, as Mr. Engle alleged, and he was thereby entitled to damages that would reduce the amount of drilling expenses he owes to Elm Ridge. Elm Ridge does not contest that it breached the Operating

Agreement.  It does contest whether there was any factual basis for the jury's finding that Mr. Engle was damaged by the use of Triple P's rig—whether Elm Ridge could have waited to use a 24-hour rig.  Elm Ridge argues that the BLM drilling permit would have expired had it waited, leading to an even costlier re-permitting process to finish drilling the well.  By not waiting, Elm Ridge contends that it saved money and Mr. Engle was not entitled to the damages adjustment for its breach.

Elm Ridge appeals the district court's denial of its three motions related to Mr. Engle's damages:

(1)  Rule 50(a) Motion - After the evidence had been presented and before the case was submitted to the jury, Elm Ridge moved for judgment as a matter of law under Rule 50(a), arguing that the evidence was insufficient to support Mr. Engle's claim for damages based on Elm Ridge's use of the more expensive daylight rig as opposed to the less expensive 24-hour rig.  After the motion was denied, Elm Ridge did not renew it after trial with a Rule 50(b) motion, which is ordinarily required to preserve the issue for appeal.

(2) Rule 59(a) Motion – Elm Ridge moved for a new trial under Rule 59(a), arguing the same basis as for its Rule 50(a) motion.

(3) Rule 59(e) Motion – Elm Ridge moved to alter or amend the judgment for the same sufficiency of the evidence reasons it argued for its Rule 50(a) and Rule

-31-

59(a) motions. Sufficiency of the evidence is properly raised under Rule 50(b), but not under Rule 59(e), and we therefore summarily affirm the district court's denial of Elm Ridge's motion based on insufficiency of the evidence as a Rule 59(e) motion. *See Loughridge v. Chiles Power Supply Co.*, 431 F.3d 1268, 1274-75 (10th Cir. 2005) ("A Rule 59(e) motion to alter or amend the judgment should be granted only to correct manifest errors of law or to present newly discovered evidence." (quotations omitted)); *see also Velazquez v. Figueroa-Gomez*, 996 F.2d 425, 427 (1st Cir. 1993) ("We have found no authority supporting the proposition that a motion under Rule 59(e) may be used to reevaluate the weight of the evidence after a jury's verdict."). As explained below, however, we regard this Rule 59(e) motion as the functional equivalent of a Rule 50(b) motion, thereby preserving Elm Ridge's Rule 50(a) motion issue for appellate review.

1.    **Standard of Review**

We review de novo a district court's decision to grant or deny a Rule 50(a) motion for judgment as a matter of law, applying the same standards as the district court. *Riske v. King Soopers*, 366 F.3d 1085, 1088 (10th Cir. 2004); *Herrera v. Lufkin Indus., Inc.*, 474 F.3d 675, 685 (10th Cir. 2007). "Judgment as a matter of law is appropriate only if the evidence points but one way and is susceptible to no reasonable inferences which may

support the nonmoving party's position." *Escue v. N. OK Coll.*, 450 F.3d 1146, 1156 (10th Cir. 2006) (quotations omitted); *Herrera*, 474 F.3d at 685. "A district court's refusal to grant judgment as a matter of law may be reversed only if the evidence is such that without weighing the credibility of the witnesses the only reasonable conclusion is in [the moving party]'s favor." *Keylon v. City of Albuquerque*, 535 F.3d 1210, 1214-15 (10th Cir. 2008) (quotations omitted); *see also Hurd v. Am. Hoist & Derrick Co.*, 734 F.2d 495, 499 (10th Cir. 1984).

We review for abuse of discretion a district court's denial of a rule 59(a) motion for new trial. *M.D. Mark, Inc. v. Kerr-McGee Corp.*, 565 F.3d 753, 762 (10th Cir. 2009); *see also Cavanaugh v. Woods Cross City*, 2013 WL 2501748, ___ F.3d ___ (10th Cir. 2013). A Rule 59(a) motion for a new trial "normally involves a review of the facts presented at trial, and thus involves the discretion of the trial court." *Escue*, 450 F.3d at 1157 (quotations omitted). In deciding a new trial motion based on insufficiency of the evidence, a district court must analyze whether the verdict "is clearly, decidedly or overwhelmingly against the weight of the evidence." *M.D. Mark*, 565 F.3d at 762 (quotations omitted).

We review a "district court's ruling on a Rule 59(e) motion for abuse of discretion." *Loughridge*, 431 F.3d at 1275. "[W]e will not reverse the decision of the district court unless the district court made a clear error of judgment or exceeded the

bounds of permissible choice in the circumstances." *Id.* (quotations omitted). As explained above, we affirm the denial of Mr. Engle's Rule 59(e) motion.

2.    **Additional Background**

James M. Clark, Jr., the president and majority owner of Elm Ridge, testified at trial that Elm Ridge was fortunate to get the Triple P daylight rig because 2008 was a very busy time and they were unable to obtain another drilling rig from a competitor or from Elm Ridge's own drilling company. He also testified that the drilling permit (the application for permit to drill, or "APD") from the BLM for the 1T well was going to expire. Elm Ridge wanted to complete the project before the permit expired because of the time, money, and personnel involved in obtaining new permits.

On cross-examination, however, Mr. Clark affirmed "that the permits were satisfied when [Elm Ridge] spudded, whether the well was drilled in October, November, December, or January." Aplee. Supp. Appx. at 342.[9] He also testified that he did not believe that there was any expiration date for the Navajo permit. Mr. Engle's counsel also asked him to review a BLM notice that the APD, originally set to expire on

---

[9] Based on this and later testimony, a reasonable jury could understand "satisfied" to mean the fulfillment of any requirements necessary to prevent the APD from expiring. Once the APD was satisfied, there would be no permit restriction on when Elm Ridge could do other work necessary to complete the well.

November 17, 2007, had been extended through November 17, 2008. Mr. Engle's counsel then asked Mr. Clark whether this notice meant that Elm Ridge had until November 17, 2008, to spud the well, and Mr. Clark responded that was correct, having previously testified that Elm Ridge spudded the well in August 2008.

Elm Ridge then called as a witness Terrence G. Lindeman, a district superintendent for Elm Ridge. Although Mr. Lindeman's testimony was not entirely clear, we understand it to mean that the BLM APD was going to expire on November 17, 2008, that Elm Ridge did not want to pay for a more expensive environmental assessment required for a new APD under a recently changed BLM policy, and that Elm Ridge therefore wanted to complete the 1T well.[10]

---

[10] Mr. Lindeman stated,

> Now, this particular well . . . we had already extended that one year, and we had—that permit was going to expire on—I think it was like 11/17 of 2008.
>
> And with that, you know, if that would have happened, then we would have been forced to go back and—at that time, BLM had also changed their standards as far as requiring the environmental assessments. So we already had paid for and had environmental assessments that were intact for this particular well, so rather than—and also, they had started raising their rates for permitting and stuff. So, economically, we needed to try and get these wells done.

Continued . . .

Mr. Lindeman further testified, however, that an APD's deadline no longer matters once surface pipe has been set down 250 to 300 feet or, at the very least, the "well has been spudded" by "set[ting] a conductor pipe." *Id.* at 384. According to Mr. Lindeman, this was a consideration in when Elm Ridge used smaller daylight rigs or larger 24-hour rigs: Elm Ridge would use smaller rigs to drill wells that went down to a maximum of 2,000 feet. The smaller rigs cannot be used to drill deep wells, such as those that reach 8,000 feet. Elm Ridge would initially use the smaller rigs on deep wells, however, to put pipe down to 250 or 300 feet. That would "hold[] those wells, or get[] them where the permits would be good." *Id.* at 384. Elm Ridge could then come back later, when a larger rig was available, to finish drilling the well.

On cross-examination, Mr. Lindeman agreed that, "once [the well] was spudded in August," Elm Ridge had "met the regulatory requirements . . . as far as starting it." *Id.* at 404.

_____

Cont.

Aplee. Supp. Appx. at 383-84.

3.    **District Court's Orders**

At trial, the district court denied without explanation Elm Ridge's Rule 50(a) motion for partial judgment as a matter of law on the damages issue.

On June 19, 2012, the district court denied Elm Ridge's combined Rule 59(a) and (e) motions. Regarding the Rule 59(e) motion to alter or amend the judgment, the court noted that the jury had found that Elm Ridge's breach increased the cost of drilling the well by $77,349 and that Elm Ridge had incurred $235,167.31 in expenses for the operations conducted in a good and workmanlike manner. The court denied the Rule 59(e) motion, concluding that awarding the full amount Elm Ridge had asked for rather than the amount awarded by the jury would be an unconstitutional reexamination of the jury's verdict. *See ClearOne Commc'ns, Inc. v. Biamp Sys.*, 653 F.3d 1163, 1179 (10th Cir. 2011) ("Additur is prohibited in the federal courts because it involves an unconstitutional reexamination of the jury verdict in violation of the Seventh Amendment." (quotations omitted)).

Turning to the Rule 59(a) motion for a new trial, the district court noted that, under New Mexico law, "a jury's assessment of damages is largely inviolate and is not to be disturbed 'except in extreme cases.'" *Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1251-52 (10th Cir. 2000) (quoting *Richardson v. Rutherford*, 787 P.2d 414, 422 (N.M. 1990)). "New Mexico case law provides two tests for determining whether an award is

-37-

so excessive that it shocks the conscience" in such extreme cases:

> (1) whether the evidence, viewed in the light most favorable to plaintiff, substantially supports the award and (2) whether there is an indication of passion, prejudice, partiality, sympathy, undue influence or a mistaken measure of damages on the part of the fact finder.

*Sandoval v. Chrysler Corp.*, 960 P.2d 834, 837 (N.M. Ct. App. 1998).

The court denied the Rule 59(a) motion, concluding that Elm Ridge's argument fell under the first test because there was substantial evidence to support the verdict. The court noted that 24-hour rigs were available by the beginning of 2009 and that Elm Ridge's expert estimated that the cost of drilling with such a rig would have been $236,800 rather than $312,516.31. The difference between the actual cost and the estimated cost of using a 24-hour rig was similar to the costs the jury found were attributable to Elm Ridge's breach.

The district court also noted that Elm Ridge had breached the Operating Agreement by not obtaining Mr. Engle's permission to use its own equipment—that of its affiliate Triple P—in drilling the well. The court stated that much of the $92,849 in expenses claimed by Elm Ridge for Triple P's services was for the costs associated with using Triple P's more expensive daylight rig. The court also stated that there was evidence that waiting for a 24-hour rig to become available would not have jeopardized the drilling permits. Because Elm Ridge could have waited to finish drilling once it had

-38-

spudded the well without jeopardizing the permits, a jury could have found that Elm

Ridge's decision to drill immediately using a more expensive rig was a violation of its

contractual duty to conduct operations as a reasonably prudent operator. The court also

stated that a jury could have reasoned that Elm Ridge was more willing to use Triple P's

more expensive rig because it knew "that much of the additional cost of drilling the well

. . . would be paid to its affiliate." Aplee. Appx. at 123.

4.     **Elm Ridge's Arguments**

Elm Ridge argues (1) that the evidence at trial demonstrated that it acted as a

prudent operator and drilled the well in a good and workmanlike manner; (2) the costs in

drilling the well were reasonable and necessary; (3) Triple P's rates were competitive; (4)

no 24-hour rigs were available; (5) the permits to drill the well would have expired if Elm

Ridge had delayed; and (6) getting new permits would have been time-consuming and

expensive.

In particular, Elm Ridge states that the district court's reliance on evidence that

24-hour rigs were available in early 2009 was misplaced. Elm Ridge explains that it was

obligated to complete the well with due diligence once it started drilling in August 2008

and had to finish drilling before the necessary permits expired. Accordingly, it is

irrelevant that 24-hour rigs became available in 2009. At issue was the type of rig

available in fall 2008, and the evidence established that the only rig available then was

Triple P's daylight rig, which came at a competitive rate compared to other daylight rigs in the area. Elm Ridge argues that the district court therefore abused its discretion in not granting a new trial because it failed to recognize that there were no 24-hour rigs available and that Elm Ridge was obliged to complete the wells with diligence and before permits expired in November 2008.

Finally, Elm Ridge argues that the district court erred as a matter of law in denying the Rule 50(a) motion for the same reasons the court abused its discretion in denying the Rule 59(a) motion.

5.    **Analysis**

Our review of the district court's denials of Elm Ridge's Rule 50(a) and Rule 59(a) motions turns on whether sufficient evidence showed that Elm Ridge could have waited until a 24-hour rig was available. But first we must address a procedural issue.

a.    *Preservation of the Rule 50(a) motion issue*

We must determine whether Elm Ridge can appeal the denial of its Rule 50(a) motion for judgment as a matter of law based on insufficiency of the evidence when it did not renew the motion under Rule 50(b) after the jury's verdict. As a general rule, the answer is no, but its Rule 59(e) motion preserves the issue.

"[T]he precise subject matter of a party's Rule 50(a) motion—namely, its entitlement to judgment as a matter of law—cannot be appealed unless that motion is renewed pursuant to Rule 50(b)." *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546

U.S. 394, 404 (2006);[11] *see also Ortiz v. Jordan*, 131 S. Ct. 884, 892 (2011) ("Absent [a Rule 50(b)] motion, an appellate court is 'powerless' to review the sufficiency of the evidence after trial."); *Woods Cross City*, ___ F.3d at ___ (a "sufficiency-of-the-evidence issue [can] only be preserved for appeal by including it in a Rule 50(a) motion at the close of evidence *and* a Rule 50(b) motion after the jury verdict").

After the close of evidence, Elm Ridge moved under Rule 50(a) "that [the] claim for damages not be presented to the jury for a lack of evidentiary foundation." Aplee. Supp. Appx. at 607. Elm Ridge did not renew the motion under Rule 50(b). Although Elm Ridge's failure to file a Rule 50(b) motion would normally foreclose review of the sufficiency of the evidence, we may review the sufficiency of the evidence here by regarding its Rule 59(e) motion as a Rule 50(b) motion.[12]

Elm Ridge raised a sufficiency of the evidence challenge in its Rule 59(e) motion.

---

[11] Before the Supreme Court's decision in *Unitherm*, appellants in the Tenth Circuit could raise a sufficiency of the evidence claim on appeal without having filed a Rule 50(b) motion if the party raised the issue under Rule 50(a). *See Cummings v. Gen. Motors Corp.*, 365 F.3d 944, 950 (10th Cir. 2004), *abrogated by Unitherm*, 546 U.S. 394.

[12] We have not yet decided whether the failure to make a Rule 50(b) motion deprives us of subject matter jurisdiction to review a Rule 50(a). *See Kelley v. City of Albuquerque*, 542 F.3d 802, 817 n.15 (10th Cir. 2008) (discussing whether the mandatory nature of Rule 50(b) is a claims-processing rule that can be waived or is a jurisdictional rule that cannot be waived and that we must address on appeal). Because we regard the Rule 59(e) motion as a Rule 50(b) motion, we do not need to decide this issue here.

As discussed above, Rule 59(e) does not apply to sufficiency of the evidence challenges. Elm Ridge may nonetheless benefit from its Rule 59(e) motion if we follow other circuits in holding that a Rule 59(e) motion may serve as a Rule 50(b) motion to preserve an issue for appeal that was initially raised in a Rule 50(a) motion. *See Coons v. Indus. Knife Co.*, 620 F.3d 38, 41 (1st Cir. 2010); *Cosgrove v. Bartolotta*, 150 F.3d 729, 732 (7th Cir. 1998).

In *Coons*, the defendant failed to renew a statute of limitations defense under Rule 50(b), but the district court granted the defendant's motion raising the defense under Rule 59(e). 620 F.3d at 41. The First Circuit held that the district court was correct in concluding that the Rule 59(e) motion "could be construed as a [Rule 50(b) motion] because it was filed within the Rule 50(b) time limit and contained all the information required for a Rule 50(b) motion." *Id*. The court also noted that construing the motion as a Rule 50(b) motion would be more straightforward because Rule 50 more clearly matched the nature of the purported error—"that it was unreasonable, on the evidence presented at trial, for the jury to reject the limitations defense." *Id*. The First Circuit therefore held that it would treat the Rule 59(e) motion as a Rule 50(b) motion. In *Cosgrove*, under similar circumstances and with similar reasoning, the Seventh Circuit agreed with the First Circuit, holding that "captions do not control." 150 F.3d at 732.

We find the First Circuit's logic persuasive and conclude that the Rule 59(e)

motion here should be construed as a Rule 50(b) motion.  Elm Ridge's Rule 59(e) motion was filed within the deadline for a Rule 50(b) motion and "contained all the information required for a Rule 50(b) motion." *Coons*, 620 F.3d at 41.  In particular, it raised insufficiency of the evidence—the exemplar of Rule 50(b) arguments.  In such a circumstance, we agree with the Seventh Circuit that a caption should not control the outcome.  *Cf. Conrad v. Phone Directories Co.*, 585 F.3d 1376, 1385 (10th Cir. 2009) (where "the court suspects that [a] motion has been mis-captioned in an attempt to take advantage of [a rule to get appellate jurisdiction], the court must look beyond the caption to the essential attributes of the motion itself").

b.      *Sufficiency of the evidence*

Elm Ridge argues that its Rule 50(a) and Rule 59(a) motions should have been granted because use of the daylight rig did not harm Mr. Engle.  The only alternative— securing a 24-hour rig—was more expensive, Elm Ridge contends, because it would have required that Elm Ridge obtain a new APD.

Elm Ridge's argument depends on the expiration of the APD by November 2008. Elm Ridge points to Mr. Clark's and Mr. Lindeman's testimony in arguing that the evidence only supported a finding that the permits were going to expire in November 2008.

To reverse the district court's denial of the Rule 50(a) motion, we would have to

-43-

conclude that "the evidence points but one way," *Escue*, 450 F.3d at 1156 (quotations omitted), and that "the only reasonable conclusion is in [Elm Ridge's] favor," *Keylon*, 535 F.3d at 1215.  Similarly, with regard to the Rule 59(a) motion, we must uphold the jury's verdict "unless it is clearly, decidedly or overwhelmingly against the weight of the evidence."  *Escue*, 450 F.3d at 1157 (quotations omitted).  In reviewing Mr. Clark's and Mr. Lindeman's testimony, we cannot conclude that either standard was met.

Mr. Clark affirmed on the stand "that the permits were satisfied when [Elm Ridge] spudded, whether the well was drilled in October, November, December, or January."  Aplee. Appx. at 342.  The spudding occurred in August 2008.  The district court understood this to mean that Mr. Clark was conceding "that waiting until a 24-hour rig became available would not have jeopardized the" APD.  *Id*. at 123.

In addition, Mr. Lindeman testified that Elm Ridge sometimes preserves its permits on deep wells—"hold[s] . . . wells, or get[s] them where the permits would be good," by spudding the well or using smaller daylight rigs to put pipe down 250 or 300 feet.  *Id*. at 384.  It then comes back later when a larger 24-hour rig is available to finish the well.  Elm Ridge's "decision" here, however, was to "go ahead and just drill [the 1T well] to [total depth]" because it was a shallower well.  *Id*. at 385.

Because the evidence does not "point[] but one way," *Escue*, 450 F.3d at 1156 (quotations omitted), we affirm the district court's denial of the Rule 50(a) motion.[13] Moreover, the jury's verdict was not "clearly, decidedly or overwhelmingly against the weight of the evidence." *Id.* at 1157 (quotations omitted). We therefore conclude that the district court did not abuse its discretion in denying the Rule 59(a) motion for a new trial and affirm. *Id.*

### E. *District Court's Denial of a Bench Trial*

Elm Ridge argues that the district court erred in submitting Count 3 of Mr. Engle's counterclaims to a jury rather than deciding it from the bench as a matter incidental to a foreclosure action. "Entitlement to a jury trial is a question of law which we review de novo." *Bowdry v. United Airlines, Inc.*, 58 F.3d 1483, 1489 (10th Cir. 1995); *see also J.R. Simplot v. Chevron Pipeline Co.*, 563 F.3d 1102, 1115 (10th Cir. 2009).

"[T]he right to a jury trial in the federal courts is to be determined as a matter of

---

[13] The district court denied the Rule 59(e) motion to amend judgment (which we have construed as a Rule 50(b) motion) only because it would constitute unconstitutional additur under federal law. "In a diversity action state law governs the propriety of an award of damages," *Smith*, 214 F.3d at 1251, however, and additur is permissible under New Mexico law, *Hicks v. Eller*, 280 P.3d 304, 312 (N.M. Ct. App. 2012), *cert. denied*, 294 P.3d 445 (N.M. 2012). Because we affirm the district court's denial of the Rule 59(e) motion on alternative grounds, we do not address the additur argument and decline to decide the relief to which a party is entitled when making an additur claim in a diversity case.

federal law in diversity as well as other actions." *Simler v. Conner*, 372 U.S. 221, 222 (1963); *see also J.R. Simplot*, 563 F.3d at 1115. Although "the substantive dimension of the claim asserted finds its source in state law" in diversity cases, "the characterization of that state-created claim as legal or equitable for purposes of whether a right to jury trial is indicated must be made by recourse to federal law." *Simler*, 372 U.S. at 222.

"The right to a jury trial as declared by the Seventh Amendment is preserved inviolate." *J.R. Simplot*, 563 F.3d at 1115. The Seventh Amendment protects this right in suits where the amount in controversy exceeds $20 and where legal rights are to be determined—as opposed to actions in equity. *Id.* "The nature of the issues presented and the remedies sought determines whether an action qualifies as 'legal.'" *Id.*

Elm Ridge brought a foreclosure claim against Mr. Engle. Because "[t]he foreclosure of mortgage liens is equitable in nature[,] such actions may be tried in the Federal courts" without a jury. *Mile High Indus. v. Cohen*, 222 F.3d 845, 856 (10th Cir. 2000). Mr. Engle counterclaimed for breach of contract and breach of fiduciary duty, which are legal claims. "The joinder of legal and equitable claims does not result in the waiver of a right to jury trial on the legal claims." *E.E.O.C. v. Ford Motor Co.*, 732 F.2d 120, 121 (10th Cir. 1984); *see also Tull v. United States*, 481 U.S. 412, 425 (1987) ("[I]f a 'legal claim is joined with an equitable claim, the right to jury trial on the legal claim, including all issues common to both claims, remains intact. The right cannot be abridged

-46-

by characterizing the legal claim as 'incidental' to the equitable relief sought.'" (quoting

*Curtis v. Loether*, 415 U.S. 189, 196 n.11 (1974))); *Colo. Visionary Acad. v. Medtronic, Inc.*, 397 F.3d 867, 875 (10th Cir. 2005).  Therefore, when a party joins legal claims as counterclaims to a foreclosure action, the party does not waive the right to a jury trial on those legal claims.  Moreover, that right "must be preserved by trying [the legal] claims first (or at least simultaneously with the equitable claims), and the jury's findings on any common questions of fact must be applied when the court decides the equitable claims." *Colo. Visionary Acad.*, 397 F.3d at 875.

1.      **District Court's Discussion**

At an October 6, 2011 hearing, Elm Ridge argued that Counterclaim Count 3 should be tried by the court rather than a jury.  It argued that the issues were incidental to deciding the foreclosure claim, and that New Mexico law therefore dictated that they be decided by the court.

Mr. Engle responded that the Counterclaim Count 3 issues—whether Elm Ridge drilled the well in a good and workmanlike manner and whether it met the prudent operator standard—could have been brought in a claim separate from the foreclosure action and had to be decided by a jury.

The district court concluded that "[t]he breach of contract issues" raised by Mr. Engle in Counterclaim Count 3 "clearly [had] to be decided by the jury."  Aplee. Appx. at

-47-

737.

2.    **Elm Ridge's Arguments**

On appeal, Elm Ridge argues that the district court should have decided the damages issues under Counterclaim Count 3 rather than submitting them to a jury. Because the amount of the debt Mr. Engle owed to Elm Ridge under the latter's foreclosure claim could not be determined without deciding Mr. Engle's damages, Elm Ridge contends that the damages issues were merely incidental to the foreclosure action. Elm Ridge therefore concludes that the district court was obligated to decide the damages issues.

Elm Ridge cites only state authority for its arguments. Because federal law determines whether Mr. Engle was entitled to a jury trial, we do not review Elm Ridge's state law arguments.

3.    **Analysis**

"[T]he characterization of [a] state-created claim as legal or equitable for purposes of whether a right to jury trial is indicated must be made by recourse to federal law." *Simler*, 372 U.S. at 222. "The nature of the issues presented and the remedies sought determines whether an action qualifies as 'legal.'" *J.R. Simplot*, 563 F.3d at 1115. For example, in another diversity case in which the plaintiff sought equitable foreclosure of liens, *Mile High Industries*, we reviewed the district court's denial of a jury trial on the defendant's counterclaim and affirmative defenses. 222 F.3d at 855. Because the

counterclaim and affirmative defenses in *Mile High Industries* were equitable in nature—cancellation of a lease, laches, estoppel, and acquiescence—we concluded that the district court had properly denied the request for a jury trial. *Id*. at 856-57.

Count 3 of Mr. Engle's counterclaim alleges both breach of contract and breach of fiduciary duty. In another diversity case involving the right to a jury trial, we held that an action "for compensatory damages resulting from a breach of contract" is an action at law. *J.R. Simplot*, 563 F.3d at 1116. Mr. Engle's breach of contract claim is therefore an action at law.

Moreover, "an action for breach of fiduciary duty which arises from contract can be based either in tort or contract." *Combs v. Shelter Mut. Ins. Co.*, 551 F.3d 991, 1001 (10th Cir. 2008) (quotations omitted). Therefore, the breach of fiduciary duty claim raised here also is an action at law. *See City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 711 (1999) (stating that a suit that sounds in tort and seeks legal relief is an action at law); *J.R. Simplot*, 563 F.3d at 1116 (breach of contract an action at law).

Mr. Engle's counterclaim states that he seeks damages under Count 3, and the district court instructed the jury on the proper considerations for awarding compensatory damages. Mr. Engle therefore sought legal relief. *See Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 215 (2002) ("[R]estitution, in contrast to damages, is a remedy

-49-

commonly ordered in equity cases and therefore an equitable remedy in a sense in which damages, though *occasionally* awarded in equity cases, are not"); *Millsap v. McDonnell Douglas Corp.*, 368 F.3d 1246, 1254 (10th Cir. 2004) ("At common law, the award of compensatory damages was peculiarly within the province of the law courts . . . [and] therefore appropriately classified as legal relief.").

Because Mr. Engle's Counterclaim Count 3 made legal claims and sought legal relief, he was entitled to a jury trial. He did not waive the right to a jury trial on those legal claims because they were joined to an action in equity. The district court did not err in granting a jury trial on Counterclaim Count 3.

### III.   CONCLUSION

For the foregoing reasons, we affirm.

-50-